OPINION OF THE COURT
Shlomo S. Hagler, J.
In this hybrid article 78 and declaratory judgment proceeding, petitioners Greater New York Taxi Association and Evgeny “Gene” Friedman moved by order to show cause and verified petition, pursuant to article 78 of the Civil Practice Law and Rules, seeking a judgment, in relevant part: (1) annulling, vacating and setting aside certain revisions and amendments to title 35 of the Rules of the City of New York which mandated the Nissan NV200 as the New York City Official Taxicab Vehicle otherwise dubbed the Taxi of Tomorrow to be effective as of October 2013 (see 35 RCNY 51-03, 67-05.IB) (the Revised Taxi of Tomorrow Rules) and (2) declaring that the Revised Taxi of Tomorrow Rules “violate the law and that these rules are without effect.”[1] Respondents New York City Taxi and Limousine Commission (TLC) and David Yassky interposed a verified answer along with voluminous opposition papers.
Thereafter, Nissan Taxi Marketing N.A. LLC and Nissan North America, Inc. separately moved for an order pursuant to CPLR 7802 (d) and 401 to intervene as an “interested party” in this proceeding and for leave to file a verified answer. Petitioners opposed the motion to intervene. After oral argument on the hearing date of September 17, 2013, this court granted Nissan’s motion to intervene, in its entirety, for the reasons stated on the record.
*326 Background
This is the second challenge to the Revised Taxi of Tomorrow Rules. In May 2013, the prior iteration of the Taxi of Tomorrow Rules was found to be unenforceable as it violated Administrative Code of the City of New York § 19-533.[2]
In or about 1971, the City Charter was amended to create the TLC with the purpose of regulating and supervising the taxi and limousine industry. From its inception, it is uncontroverted that the New York City taxi fleet comprised various makes and models of vehicles made by different automobile manufacturers. These makes and models were then modified or “hacked-up” for use as taxis. In essence, the TLC set the specific standards for the composition and hack-up of taxis and the medallion owners were given the freedom to purchase any make or model of vehicle from any manufacturer who met those exacting standards.
This long-standing historical perspective changed in December 2009, when the TLC issued a request for proposals inviting automobile manufacturers and designers to submit plans for an “iconic” New York City taxi to be the exclusive and sole manufacturer of a purpose-built vehicle called the Taxi of Tomorrow. In November 2010, the TLC announced three finalists for the Taxi of Tomorrow: the Karsan VI, the Ford Transit Connect, and the Nissan NV200. The TLC then held an online public opinion poll to determine the public’s reaction to the three finalists. In May 2011, the TLC announced that the Nissan NV200 was the winner of the Taxi of Tomorrow competition. The Nissan NV200 is neither a hybrid nor wheelchair accessible vehicle, but can be retrofitted for accessibility at an additional cost of approximately $14,000.
In September 2012, the TLC held a hearing regarding a proposed rule change mandating owners of unrestricted medallions to purchase the Nissan NV200. Later that month, the TLC designated the Nissan NV200 as the Official Taxicab Vehicle or Taxi of Tomorrow and required owners of unrestricted medallions to purchase the Nissan NV200, effective October 2013.
In October 2012, the City of New York and Nissan entered into a contract for a term of 10 years wherein Nissan was granted the exclusive right to manufacture and supply the Official Taxicab Vehicle and replacement parts. The vehicle supply *327 agreement provides that the manufacturer’s suggested retail price (MSRP) for the 2014 NV200 model is $29,700 and that the MSRP would increase by about $200 each year for the remaining nine years.
As stated above, the above rules were challenged and found violative of Administrative Code of the City of New York § 19-533 as there was no option available for medallion owners to purchase a hybrid vehicle. As a result, in May 2013, the TLC promulgated the Revised Taxi of Tomorrow Rules to comply with Administrative Code of the City of New York § 19-533. In June 2013, a public hearing was held to essentially offer unrestricted medallion owners an option to purchase hybrid vehicles until Nissan develops a hybrid version of the Nissan NV200.
In or about 2005, the TLC previously set the standard EPA interior volume index specification for taxis at 101.5 cubit feet. Initially, the Revised Taxi of Tomorrow Rules significantly increased the EPA interior volume index specification for taxicab vehicles to 138 cubic feet, but later at the public hearing Yassky decreased that specification to 130 cubic feet. These rule changes effectively reduced the pool of approved hybrid taxi vehicles from about 10 models to just three models: the Lexus Hybrid, the Toyota Highlander Hybrid and the Toyota Prius V
Standard for Article 78 Proceedings
A court may not disturb an administrative or agency determination unless there is no rational basis for the exercise of discretion or the action is arbitrary or capricious. (Matter of Pell v Board of Educ. of Union Free School Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County, 34 NY2d 222, 230-231 [1974].) The arbitrary and capricious test relates to whether the administrative action should have been taken or is justified. (Id. at 231.)
Issues
There are two issues that would determine the validity of the Revised Taxi of Tomorrow Rules as follows:
1. Did the TLC act outside its authority in contracting with Nissan to provide it with the exclusive right to manufacture and supply the New York City Official Taxicab Vehicle and replacement parts which owners of unrestricted medallions must eventually purchase at a predetermined MSRP?
2. Do the Revised Taxi of Tomorrow Rules violate the separation of powers doctrine?
*328 Agency Authority
It is a general principle that an administrative agency or body derives its authority or power to act from the express dictates of the legislature. (Suffolk County Bldrs. Assn. v County of Suffolk, 46 NY2d 613, 620 [1979].) In other words, the legislature may delegate a broad range of powers to the administrative agency or body. However, this delegation of authority to an agency or body must strictly “coincide with its enabling statute.” (Matter of New York State Superfund Coalition v New York State Dept. ofEnvtl. Conservation, 75 NY2d 88, 92 [1989].) It, therefore, naturally follows that an agency or body “can act only to implement their charter as it is written and as given to them.” (Finger Lakes Racing Assn, v New York State Racing & Wagering Bd., 45 NY2d 471, 480 [1978]; Matter of Tze Chun Liao v New York State Banking Dept., 74 NY2d 505, 510 [1989].) However, the agency or body may not act or promulgate rules in contravention of the will of the legislature. (Finger Lakes Racing Assn., 45 NY2d at 480.)
The New York City Council created the TLC through the amendment of the New York City Charter (Local Law No. 12 [1971] of City of NY; NY City Charter § 2300). Thus, the TLC’s enabling statute is the New York City Charter. The purpose of the TLC was clearly defined as it was specifically delegated the enumerated authority to set “standards of service, standards of insurance and minimum coverage; standards for driver safety, standards for equipment safety and design; standards for noise and air pollution control; and to set standards and criteria for the licensing of vehicles, drivers and chauffeurs, owners and operators engaged in such services.” (NY City Charter § 2300.) The express overarching powers and duties of the TLC include “the regulation and supervision of the business and industry of transportation of persons by licensed vehicles for hire in the city, pursuant to provisions of this chapter.” (NY City Charter § 2303 [a].) The remaining provisions of this chapter elaborate on the TLC’s authority to specifically regulate and supervise the taxi and limousine industry as generally set forth above.
Before this court can determine whether TLC acted rationally in promulgating the Revised Taxi of Tomorrow Rules, it must ascertain if the TLC had the authority to act under the City Charter in the first instance. (Matter of Beer Garden v New York State Liq. Auth., 79 NY2d 266 [1992].) It is self-evident that City Charter § 2300 provides the TLC with a “broad grant of authority ... to promulgate and implement a pervasive *329 regulatory program for the taxicab industry, including standards and conditions of service, safety, design, comfort and convenience.” (Matter of New York City Comm. for Taxi Safety v New York City Taxi & Limousine Commn., 256 AD2d 136, 136-137 [1st Dept 1998] [citation omitted].) As such, under this broad regulatory authority, it has been held that the TLC can promulgate: (1) financial disclosure rules (id.); (2) credit card processing rules and creation of drivers’ health and disability fund (Greater N.Y. Taxi Assn. v New York City Taxi & Limousine Commn., 40 Misc 3d 1062 [Sup Ct, NY County 2013, Hunter, J.]); (3) an e-hail pilot program (Black Car Assistance Corp. v City of New York, 2013 NY Slip Op 30824[U] [Sup Ct, NY County 2013, Huff, J.]); and (4) rules requiring the installation in taxis of new software and hardware technology which was intended to improve service called the Taxicab Technology System (TTS) (Alexandre v New York City Taxi & Limousine Commn., 2007 WL 2826952, 2007 US Dist LEXIS 73642 [SD NY, Sept. 28, 2007, No. 07 Civ. 8175(RMB), Berman, J.]).[3]
The above-mentioned rules fit more or less within the TLC’s authority under the City Charter, which is to regulate and establish standards for the taxi industry. With the promulgation of the Revised Taxi of Tomorrow Rules, the TLC veered in a different direction and went beyond its prescribed regulatory authority in the City Charter. On this voluminous record and upon further independent research, there is no prior precedent for the TLC to contract with a particular vendor to bind medallion owners to purchase a single, complete vehicle at a predetermined price.[4]
*330 The actions by the TLC are akin to the actions taken by the Commissioner of Licenses of the City of New York in the two earlier cases of Matter of Executive Serv. Corp. v Moss (256 App Div 345 [1st Dept 1939]) and Acorn Empl. Serv. v Moss (292 NY 147 [1944]). In both of these cases, Commissioner Moss required or conditioned employment agencies seeking to obtain a license from the City of New York to provide a written contract between the employer and employee if the employment extended beyond a week’s salary. In both cases, the Court of Appeals and the Appellate Division held that the Commissioner exceeded his power under the applicable enabling statute. By analogy to the above cases, the City Charter does not vest the TLC authority to contract with Nissan to provide it with the exclusive right to manufacture and supply the New York City Official Taxicab Vehicle and replacement parts which owners of unrestricted medallions must eventually purchase at a predetermined MSRE
Simply stated, the power to contract and compel medallion owners to purchase the Nissan NV200 from Nissan for 10 years does not exist in the City Charter. This is not a form of regulation, but a binding and enforceable obligation executed by the City of New York and Nissan which require medallion owners to purchase the Nissan NV200 without input or direct negotiations from the medallion owners in the terms of the agreement.[5]
If the TLC was vested with the authority to contract for the medallion owners with third-party vendors, the TLC may, for instance, also have the authority to mandate the purchase of special insurance from a particular insurance company or even to purchase a more efficient fuel from a designated vendor at predetermined prices. This conclusion would inevitably lead us down the proverbial slippery slope even if such rules were well-intentioned. As such, this court holds that the TLC exceeded its authority when it promulgated the Revised Taxi of Tomorrow Rules.
The Separation of Powers Doctrine
Assuming arguendo that the TLC did not exceed its authority under the City Charter, the TLC’s promulgation of the Revised Taxi of Tomorrow Rules would nonetheless violate the separation of powers doctrine as stated below.
*331 A discussion of the separation of powers doctrine must begin with the analysis of the Court of Appeals’ landmark decision in Boreali v Axelrod (71 NY2d 1 [1987] [the Court of Appeals held that the Public Health Council (PHC) engaged in impermissible policy-making activity when it promulgated rules prohibiting smoking in certain indoor public places]) and continues with the First Department’s latest pronouncement of this doctrine in Matter of New York Statewide Coalition of Hispanic Chambers of Commerce v New York City Dept. of Health & Mental Hygiene (110 AD3d 1 [1st Dept 2013] [First Department held that the New York City Board of Health’s “Soda Ban” which prohibited sugary drinks in sizes larger than 16 ounces violated the separation of powers doctrine]).
As applied to this case, the separation of powers doctrine prohibits the City Council from delegating its policy-making authority to the TLC. Moreover, the TLC may not exercise its rule-making authority if it impinges on the City Council’s policy-making authority. It is somewhat difficult to discern whether the administrative agency or body overstepped its rule-making authority and veered into legislative policy-making as follows:
“A number of coalescing circumstances that are present in this case persuade us that the difficult-to-define line between administrative rule-making and legislative policy-making has been transgressed. While none of these circumstances, standing alone, is sufficient to warrant the conclusion that the PHC has usurped the Legislature’s prerogative, all of these circumstances, when viewed in combination, paint a portrait of an agency that has improperly assumed for itself ‘[t]he open-ended discretion to choose ends’ which characterizes the elected Legislature’s role in our system of government.” (Boreali, 71 NY2d at 11 [citation omitted].)
In Boreali, the Court of Appeals relied on fours factors in deciding that the PHC engaged in impermissible legislative policy-making authority as follows:
1. PHC balanced between competing concerns of public health, costs and privacy interests “acting solely on [its] own ideas of sound public policy” {id. at 12);
2. PHC did not engage in typical administrative “interstitial” rulemaking, but it “wrote on a clean slate, creating its own comprehensive set of rules without benefit of legislative guidance” {id. at 13);
*332 3. PHC “acted in an area in which the Legislature had repeatedly tried — and failed — to reach agreement in the face of substantial public debate and vigorous lobbying by a variety of interested factions.” (Id.) The Court of Appeals rejected PHC’s exercise of discretion because “it is the province of the people’s elected representatives, rather than administrators, to resolve difficult social problems by making choices among competing ends” (id. [emphasis added]); and
4. PHC did not employ special expertise in the field of health in promulgating the challenged anti-smoking regulations. (Id. at 14.)
The First Department interpreted the above Boreali factors as mere indicators, and not as a four-part rule in which all four elements must be present in each case as follows: “[The Court of Appeals in] Boreali intended the four factors to be interpreted as indicators of the usurpation of the legislature, rather than a talismanic rule of four required elements that must all be present in every case.” (New York Statewide Coalition of Hispanic Chambers of Commerce, 110 AD3d at 9.) As the First Department reiterated, subsequent to deciding Boreali, the Court of Appeals had not itself utilized all four factors in later cases. (Id. at 208.) Not only did the Court of Appeals not even mention all four factors, it seemed to emphasize the second factor. (Matter of Tze Chun Liao, 74 NY2d at 510; Matter of Medical Socy. of State of N.Y. v Serio, 100 NY2d 854, 865 [2003].) Inasmuch as the Court of Appeals emphasized the second factor, this Court’s analysis will begin there and continue with those factors that are more indicative of relevant importance to this determination.
As specifically detailed above, the City Council has not delegated to the TLC the authority to contract with a third-party vendor to manufacture a vehicle that would be the exclusive taxi for the City of New York for the next 10 years and medallion owners would be mandated to purchase the same at a predetermined MSRE This exercise of discretion does not come within the ambit of the TLC’s typical administrative “interstitial” rule-making function which had historically entailed setting standards for the technical composition of the taxicab and the medallion owners’ resulting responsibility to meet such standards in the selection of their vehicles.[6] Thus, the TLC ef *333 fectively “wrote on a clean slate, creating its own comprehensive set of rules without benefit of legislative guidance.” (Boreali at 13.)
The notion that New York City should have one exclusive “iconic” New York City taxicab is a policy decision that is reserved for the City Council. No special expertise is needed to make that policy decision. However, once the City Council makes that policy decision, the City Council may rely and defer to the TLC’s technical expertise to set the standards for such an exclusive “iconic” New York City taxicab within subsequent legislation.
There has been considerable discussion by the City Council concerning the need for increased hybrid electric and clean-air and accessible taxicabs. As a result, the City Council passed legislation requiring the TLC to approve one or more hybrid taxicabs and to significantly increase the number of clean-air and wheelchair accessible vehicles in New York City (Administrative Code §§ 19-533, 19-534, 19-535). When this legislation was passed, “the Chair of the Transportation Committee at the time, John Liu, cited the City Council’s strong commitment to hybrid vehicles and position ‘that we would like to see the entire fleet, both accessible and environmentally sound, as soon as possible.’ ” (Committee for Taxi Safety, Inc. v City of New York, 40 Misc 3d at 938.) The City Council’s strong commitment to increase hybrid and clean-air taxicabs was stated in the legislative intent of these statutes. The issue of accessible taxicabs continued in light of a federal class action lawsuit brought against the TLC for alleged violations of the Americans with Disability Act. (See Noel v New York City Taxi & Limousine Commn., 687 F3d 63 [2d Cir 2012].) This may have prompted the City Council to debate a local law “requiring that all newly manufactured taxicabs be accessible to people with disabilities.” (Aff of Fidel F. Del Valle, sworn to July 24, 2013, ¶ 19.)
While the City Council may not have debated the specific selection of one exclusive “iconic” New York City taxicab, it certainly expressed a generally robust interest in the field through both its discussion and legislation of clean-air and accessible taxicabs. As such, it is the province of the City Council, rather than the TLC, to make a policy decision that New York *334 City should have one taxicab that is a hybrid, clean-air and/or an accessible vehicle. (Boreali at 13.)
Furthermore, the TLC balanced between competing concerns of consumer comfort, cost and the need to increase the number of hybrid, clean-air and accessible taxicabs in the Revised Taxi of Tomorrow Rules. Instead of selecting an iconic New York City taxicab that is a purpose-built hybrid, clean-air and/or accessible vehicle, the TLC balanced the above concerns and acted solely on its own ideas of sound policy. (Id. at 12.)
Conclusion
Accordingly, it is ordered, that the motion of Nissan Taxi Marketing N.A. LLC and Nissan North America, Inc. to intervene is granted; and it is further ordered, adjudged and declared, that the petition is granted and the revisions and amendments to title 35 of the Rules of the City of New York which mandated the Nissan NV200 as the New York City Official Taxicab Vehicle otherwise dubbed the Taxi of Tomorrow to be effective as of October 2013 (the Revised Taxi of Tomorrow Rules) are invalid as they violate the separation of powers doctrine and the TLC exceeded its authority.

. This court has not and will not express any personal opinion as to the desirability or undesirability of the Nissan NV200 as the New York City official taxicab, and will only decide the legal issues set forth herein.

. See Committee for Taxi Safety, Inc. v City of New York, 40 Misc 3d 930 (Sup Ct, NY County 2013, Moulton, J.).

. The TLC’s argument that this case stands for the proposition that it has the general authority to contract for medallion owners is misplaced as the TTS system was more limited in scope and fit more narrowly within the TLC’s regulatory authority. Moreover, the federal court never delved into whether the TLC’s authority coincided with its enabling statute or whether it had the power to contract for a particular vendor for the TTS system. The thrust of the decision dealt primarily with whether the rule violated federal protections and constituted “a deprivation of [plaintiffs’] property without due process in violation of the Fourth, Fifth and Fourteenth Amendments.” (2007 WL 2826952, *1, 2007 US Dist LEXIS 73642, *4.)

. This court is aware of General City Law § 20 (1) and article 5-A of the General Municipal Law which merely provide the general authority for municipalities to enter into contracts on their own behalf, and not for third parties. Similarly, New York City Charter §§ 310, 317 and 321 concern procurement of goods or services to be paid out of New York City funds. The above statutes do not authorize the City of New York to contract for a third party with third-party funding.

. The mandated public hearing on the Revised Taxi of Tomorrow Rules is not a substitute for such input and negotiations.

. While this court is mindful that such implementation of standards may possibly result in medallion owners selecting one vehicle, that has never oc *333 curred since the creation of the TLC in 1971. Even if that eventuality could possibly occur, that may be a legitimate exercise of TLC’s rule-making authority.