[988 NYS2d 5]

GREATER NEW YORK TAXI ASSOCIATION et al., Respondents, v NEW YORK CITY TAXI AND LIMOUSINE COMMISSION, a Charter-Mandated Agency, et al., Appellants, and NISSAN TAXI MARKETING, N.A., LLC, et al., Intervenors-Appellants.

First Department, June 10, 2014

### APPEARANCES OF COUNSEL

*Jeffrey D. Friedlander, Acting Corporation Counsel,* New York City (*Elizabeth I. Freedman, Leonard Koerner* and *Nicholas R. Ciappetta* of counsel), for New York City Taxi and Limousine Commission and another, appellants.

*Jenner & Block LLP,* New York City (*Peter J. Brennan* and *Harold M. Greenberg* of counsel), for Nissan Taxi Marketing, N.A., LLC and another, appellants

*Mintz & Gold LLP,* New York City (*Steven G. Mints, Lisabeth Harrison* and *Richard H. Topaz* of counsel), for respondents.

*Kostelanetz & Fink, LLP,* New York City (*Claude M. Millman* and *Caroline Rule* of counsel), for amici curiae.

OPINION OF THE COURT

Saxe, J.

We hold that the iconic "Taxi of Tomorrow"—the Nissan NV200—developed and implemented by New York City's Taxi and Limousine Commission (TLC) after years of public vetting, is a legally appropriate response to the agency's statutory obligation to produce a twenty-first century taxicab consistent with the broad interests and perspectives that the agency is charged with protecting. Accordingly, we reverse Supreme Court's grant of the petition brought by certain taxi fleet owners challenging the TLC's designation of an "Official Taxicab Vehicle," based on its finding that the agency exceeded its grant of authority under the New York City Charter and violated the separation of powers doctrine.

Background

The TLC was created in 1971 to license and regulate vehicles for hire in New York City, including yellow taxis, livery cabs, limousines, paratransit vehicles and commuter vans. The first sentence of the New York City Charter provision creating the TLC states that the TLC's overall purpose is "the continuance, further development and improvement of taxi and limousine service in the city of New York" (NY City Charter § 2300). More importantly, the same provision states that "the further purpose of the commission, consonant with the promotion and protection of the public comfort and convenience[,] [is] to adopt and establish an overall public transportation policy governing taxi, coach, limousine, wheelchair accessible van services and commuter van services" (id.). This language could hardly be stronger or more expansive; the TLC's assigned mission is to *establish public transportation policy* to develop and improve New York City taxi service.

One element of that broad mission is contained in the Charter's directive that the TLC establish rates and standards for service, insurance, minimum coverage, driver safety, equipment safety and design, noise and air pollution control, and for the licensing of vehicles, drivers, owners and operators engaged in such services (*see* NY City Charter § 2303). Notably, the provisions directing the setting of standards and specifications are merely a part of the overall directives of the Charter. The Charter specifies a limit to the TLC's authority in only one respect: "Additional taxicab licenses may be issued from time to time only upon the enactment of a local law providing therefor" (*see* NY City Charter § 2303 [b] [4]).

Since its inception, the TLC has performed its prescribed duties without further legislative direction, with one exception. In 2005, based on findings that the TLC's specifications for taxicabs had "prevented many promising alternative fuel vehicles . . . from being used as taxicabs" merely because they failed to meet TLC specifications "by minimal amounts," the New York City Council enacted a law requiring the TLC to "approve one or more hybrid electric vehicle models for use as a taxicab within ninety days after the enactment of this law" (*see* Admininstrative Code of City of NY § 19-533; Local Law No. 72 [2005] of City of NY § 1). The TLC abided by this direction, and the fleet of New York City taxicabs now includes thousands of hybrid vehicles, with eight different models currently in use.

With the exception of the 2005 legislative direction, however, the TLC has exercised its expansive authority unchallenged. Indeed, at the beginning of the last decade, following a collaboration with Ford, the TLC set its taxicab vehicle specifications to match the stretch version of the Ford Crown Victoria. Consequently, the Ford Stretch Crown Victoria became the dominant vehicle in the taxi fleet for a time. The TLC did, however, also allow medallion owners to alter other vehicle models to meet the specifications it set; such alteration was termed "hacking up" the vehicle.

The "Taxi of Tomorrow" Program

By 2007, the Ford Stretch Crown Victoria was still the dominant car in the New York City taxi fleet, followed by the Ford Escape SUV hybrid. However, production of both of those models was about to be discontinued, which would create substantial uncertainty among medallion and vehicle owners about new vehicles that would meet, or could be modified to meet, TLC specifications. The TLC convened an advisory committee in August 2007 to solicit input from the various stakeholders, including owners, drivers and riders, as well as disability advocates and environmental advocates. Based upon that input, the TLC determined that instead of simply setting standards and specifications for New York City medallion taxicabs, thereby leaving each owner responsible for purchasing a vehicle and having it "hacked up" to meet the agency's specifications, it would best meet the needs of all taxi industry stakeholders and the public if the City entered into an arrangement with a single automobile manufacturer that could design a vehicle that would meet all the TLC's specifications without any need for modification.

The TLC did not do this alone or in a vacuum. It acted in conjunction with other elements of City government, in a very public, and widely publicized, process that took years, and involved obtaining substantial input from the public as well as from groups representing all interested parties.

To begin the process, on February 20, 2008, the TLC issued a Request for Information, which introduced the "Taxi of Tomorrow" concept. Following the compilation of the information received, on December 17, 2009, New York City's Department of Citywide Administrative Services issued a Request for Proposals (RFP), stating that the TLC was seeking a highly qualified "Original Equipment Manufacturer" to develop a vehicle with high safety standards, superior passenger experience, superior driver comfort and amenities, appropriate purchase price and maintenance and repair costs, minimal environmental impact during the life of the vehicle, minimal physical footprint with more useable interior space, accessibility for disabled users, and an iconic design. In response to the RFP, the City received seven proposals, which were reviewed by an evaluation committee. Three finalists were selected: the Nissan NV200, the Ford Transit Connect, and the Karsan USA V1. The three finalists were announced on November 15, 2010 on the TLC's website and in the media; the Mayor's Office issued a press release, and photographs were made available on the City's website. Members of the public could provide feedback and vote on their desired taxi design features.

A thorough review of the three finalists' proposals was conducted, including several rounds of interviews. The Nissan model received the highest rating and had the lowest ownership cost.

Following the lengthy and comprehensive evaluation process, on May 3, 2011, Mayor Bloomberg announced the selection of the Nissan NV200 as the Taxi of Tomorrow. The TLC and Nissan executed a letter of intent with respect to a contractual agreement regarding the use of the Nissan NV200 vehicles as New York City taxicabs.

After months of negotiations, the City and Nissan agreed on a 10-year manufacture and supply contract, titled "Vehicle Supply Agreement," which granted Nissan the exclusive right to manufacture and supply the "Official Taxicab Vehicle" and replacement parts to holders of unrestricted New York City medallions. The agreement requires, among other things, that the vehicles be tested in accordance with federal safety stan-

dards and meet detailed specifications. The agreed-on model was to have enhanced driver and passenger comfort features, including ample legroom, dual manual sliding doors, rear passenger entry steps, passenger reading lights, adjustable driver and passenger seats, built-in GPS navigation system, rear passenger HVAC controls, USB charge ports, transparent roof panel, and floor lighting. The agreement also requires Nissan to modify the Taxi of Tomorrow upon request, to make it fully wheelchair accessible; the vehicle has other features designed to aid passengers with disabilities, including grab handles and deployable side steps.

After a hearing, the TLC amended the rules codified in RCNY title 35, chapter 67, entitled "Rules for Taxicab Hack-up and Maintenance." The new rules, entitled the "Original Taxi of Tomorrow Rules," required that after October 31, 2013, holders of unrestricted medallions issued prior to January 1, 2012, who were scheduled to replace their taxi vehicles due to age or condition, purchase the Nissan NV200.

The Previous Action

However, those rules were vacated by Supreme Court, New York County, for failure to allow for the purchase and use of hybrids for unrestricted medallions, as required by Administrative Code § 19-533, enacted by the City Council in 2005 (see *Committee for Taxi Safety, Inc. v City of New York*, 40 Misc 3d 930 [Sup Ct, NY County 2013]). Responding to that decision, on May 20, 2013, the TLC drafted a revision of its "Taxi of Tomorrow Rules" to provide that owners of unrestricted medallions acquiring a new vehicle after the set activation date could purchase either the Taxi of Tomorrow or an approved hybrid meeting the standards set forth in the TLC's rules, until such time as Nissan developed a hybrid model compliant with section 19-533. Following a public hearing, the TLC formally adopted the revised Taxi of Tomorrow rules and Hybrid Specifications, authorizing, in addition to the Nissan NV, purchase of the hybrid vehicles the Toyota Highlander, the Lexus RX, and the Toyota Prius V.

The Present Action

This combined declaratory judgment action and special proceeding was then commenced by petitioners, an association of fleet owners and a fleet owner that owns both restricted and unrestricted medallions, for a judgment declaring the revised Taxi of Tomorrow rules and Hybrid Specifications invalid. Petitioners contend that the challenged rules were beyond the

TLC's authority and constituted an improper usurpation of the legislative authority of the City Council. Notably, the fleet owners' challenge was not joined by any member of the general public or its legislative representatives.

Supreme Court agreed with petitioners, and declared the revised Taxi of Tomorrow rules invalid (42 Misc 3d 324 [2013]).

Discussion—The Agency's Authority

An administrative agency such as the TLC derives its authority from the express dictates of the legislative body that creates it (*see Suffolk County Bldrs. Assn. v County of Suffolk*, 46 NY2d 613, 620 [1979]). Of course, it may not act or promulgate rules in contravention of its enabling statute or charter (*Finger Lakes Racing Assn. v New York State Racing & Wagering Bd.*, 45 NY2d 471, 480 [1978]). Nevertheless, an administrative agency "is clothed with those powers expressly conferred by its authorizing statute, as well as those required by necessary implication" (*Matter of City of New York v State of N.Y. Commn. on Cable Tel.*, 47 NY2d 89, 92 [1979]).

"Where an agency has been endowed with broad power to regulate in the public interest, we have not hesitated to uphold reasonable acts on its part designed to further the regulatory scheme" (*id.*). "[T]he propriety of its action often depends upon the nature of the subject matter and the breadth of legislatively conferred authority" (*id.* at 92-93).

■ Here, as in the *Commn. on Cable Television* matter, "far-reaching control has been delegated to a commission charged with implementing a pervasive regulatory program" (*id.* at 93). This "far-reaching control" granted to the TLC by the New York City Charter gave the agency full authority for its actions. Although the Charter's directions *included* establishing standards and specifications, the agency was not *limited* to establishing standards and specifications. The language of the Charter provision reflects an expansive mandate to develop and improve taxi and limousine service, expressly including a direction "to adopt and establish an overall public transportation policy governing taxi . . . service[ ]" (NY City Charter § 2300).

Yet the dissent concludes that despite its grant of authority to the TLC to set policy, the Charter actually limits the TLC to adopting only the standards and specifications that are specifically listed in the Charter. That position simply ignores the broad language of the Charter that makes clear that the directive that the TLC establish rates and standards in such areas as

service, insurance, minimum coverage, driver safety, equipment safety and design, noise and air pollution control, and for the licensing of vehicles, drivers, owners and operators engaged in such services (*see* NY City Charter § 2303) merely specifies one aspect of the agency's broad mission.

It is also puzzling that the dissent points to Administrative Code § 19-533 to demonstrate that a code provision is required to empower the TLC to approve a vehicle for use as a taxi. Before and since that 2005 legislative direction, the TLC has exercised its expansive authority unchallenged. It even collaborated with Ford to set its taxicab vehicle specifications to match the stretch version of the Ford Crown Victoria.

The TLC carried out its assigned mission with an exacting process lasting from 2007 to 2011, obtaining input from all conceivable interests and concerns, to ensure a final decision that would best satisfy taxi passengers, owners, and drivers, as well as the general public. The agency's selection and authorization of a specific, specially designed model as the exclusive model for New York City taxis, was well within the agency's purview of establishing the policy governing taxi service.

Petitioners do not challenge the agency's right to adopt a list of specifications so thorough and so exacting that only one vehicle would satisfy them, as it did with the Ford Stretch Crown Victoria, although adopting specifications that only one model would satisfy would make that one model the de facto official New York City taxi. Therefore, there can be no question that the TLC could have prescribed specifications that would leave medallion owners with only one non-hybrid purchase option: the Nissan NV200.

Yet, petitioners distinguish between the permissible adoption of specifications that are only satisfied by one model of vehicle, and what they view as the impermissible selection of a specific, specially designed vehicle as the sole model to be used as New York City (non-hybrid) taxis. In reality, however, the only real difference between the issuance of such detailed specifications, on one hand, and the adoption of the Taxi of Tomorrow project, on the other, is that the Taxi of Tomorrow project set the detailed specifications before the car was manufactured, and then ensured the manufacture of a vehicle that would satisfy all its requirements, rather than providing specifications as a basis for required aftermarket retrofitting.

By proceeding as it did, the TLC actually benefitted all concerned. The agency was able to wield negotiating power un-

available to individual medallion owners, to arrange for the creation of a taxi possessing all the qualities it sought, along with price caps and other protections. Having the cars manufactured to specifications rather than hacked-up after manufacture provides additional benefits for driver safety and comfort, since only in this manner are partitions installed as part of the manufacturing process, rather than afterwards, which allows for the driver's seat to be adjustable, and avoids the problem of the partition interfering with the deployment of side curtain airbags. In sum, the TLC's selection of the Taxi of Tomorrow does not represent a significant departure from its past practice, except insofar as it provided substantial additional benefits to riders, drivers, owners, and the public, while ensuring that future New York City taxis will be the best possible vehicle for the job. It should be recognized that if the TLC had proceeded in the manner that the dissent suggests, and adopted a set of specifications that mirrored the attributes of the Nissan NV200 without making exclusive arrangements for the manufacture of that exact vehicle, there would exist no such vehicle, nor would such a vehicle necessarily be created. While in theory more than one manufacturer or vehicle could satisfy those specifications, in reality the agency would have succeeded only in setting a standard that no currently existing vehicle could meet, that no post-manufacture hack-up could fully achieve, and that *no manufacturer would undertake in the absence of certainty as to the market for the product.*

■ Nor do we agree with the motion court that the TLC's actions were unauthorized because entering into the Vehicle Supply Agreement was not "within the ambit of the TLC's typical administrative 'interstitial' rule-making function" (42 Misc 3d at 332). Importantly, the agreement was entered into, not by the TLC, but by the New York City Department of Citywide Administrative Services, which, under New York City Charter § 823 (d), is authorized "to procure, supply and manage contractual services . . . for the use of city agencies."

In concluding that the TLC exceeded its authority, the motion court reasoned that recent case law approving other actions by the TLC were inapposite, because dictating the use of a single vehicle is on a different order of magnitude than adopting regulations (42 Misc 3d at 329, citing e.g. *Matter of New York City Comm. for Taxi Safety v New York City Taxi & Limousine Commn.*, 256 AD2d 136 [1st Dept 1998] [financial disclosure rules], *Greater N.Y. Taxi Assn. v New York City Taxi & Limou-*

*sine Commn.*, 40 Misc 3d 1062 [Sup Ct, NY County 2013] [credit card processing rules], and *Black Car Assistance Corp. v City of New York*, 2013 NY Slip Op 30824[U] [Sup Ct, NY County 2013], *affd* 110 AD3d 618 [1st Dept 2013] [e-hail pilot program]). However, the mere absence of case law addressing a similar program does not constitute grounds for rejecting the program.

The motion court analogized this case to two old cases involving the actions of the New York City Commissioner of Licenses, *Acorn Empl. Serv. v Moss* (292 NY 147 [1944]) and *Matter of Executive Serv. Corp. v Moss* (256 App Div 345 [1st Dept 1939]). However, those cases are distinguishable, because the enabling legislation that gave the Commissioner of Licenses the authority to award or deny licenses did not include the type of broad, policy-making mandate that the Charter gave to the TLC.

While not dispositive of the issue, it is notable that the City Council did not seem to believe that the TLC was exceeding the authority it had granted. No City Council member or representative appears in this proceeding to claim that the Council's authority was bypassed; nor is there any indication that over the years during which the TLC engaged in the elaborate, public process leading to the adoption of the final Taxi of Tomorrow program, the City Council gave any indication that it believed its authority was being usurped. The dissent echoes petitioners' assertion that the City Council is "actively debating" the issue of the composition of the taxicab fleet, implying that the City Council has undertaken consideration of whether a particular single vehicle should be adopted as the official City taxicab. However, petitioners' submissions to support this assertion are limited to the City Council's focus on the issues of compliance with the Americans with Disabilities Act, the proportion of the fleet that should be handicap-accessible, and air quality and the number of vehicles that should be required to be hybrid or electric. Nothing in the record reflects an intent on the part of the City Council to concern itself with whether or not a single vehicle should be adopted as the official taxi of New York City.

Ultimately, the key to determining whether an agency has exceeded the scope of its authority is not in examining other cases, but in examining the enabling legislation. The scope of the mandate established by City Charter § 2300 is sufficiently expansive to permit the TLC to act as it did.

Separation of Powers

A related, although separate, issue is whether the TLC's adoption of the revised Taxi of Tomorrow rules violated the separa-

tion of powers doctrine. That doctrine holds that "[b]ecause of the constitutional provision that '[t]he legislative power of this [s]tate shall be vested in the [s]enate and the [a]ssembly (NY Const, art III, § 1), the Legislature cannot pass on its lawmaking functions to other bodies" (*Matter of Levine v Whalen*, 39 NY2d 510, 515 [1976]). However, the legislature *may* delegate to an agency the power to administer the law as enacted by the legislature (*id.*).

The TLC's actions were not violative of the doctrine. In *Levine v Whalen*, the Court found that there was no constitutional infirmity in the legislature's delegation to the New York State Department of Health of "comprehensive responsibility for the development and administration of the state's policy with respect to hospital and related services" (Public Health Law § 2800), although the Court annulled the State Commissioner of Health's revocation of a hospital's operating certificate on other grounds. The Court explained:

> "There was and is good reason to expect that officials of the Department of Health would be vastly more familiar with and more competent to cope with hospitals and related services throughout the State than individual legislators. Practical necessities compelled the Legislature to assign broad functions to the department and to leave to it the duty of bringing about the result pointed out by statute" (39 NY2d at 516-517).

The equivalent reasoning is applicable here, in view of the City Council's delegation to the TLC of comprehensive responsibility for policy relating to all aspects of the City's for-hire transportation services.

In *Boreali v Axelrod* (71 NY2d 1 [1987]), the Court struck down a rule adopted by the Public Health Council, prohibiting smoking in a variety of indoor public locations, but exempting certain types of establishments such as bars and small restaurants. The agency had explained that it included the exemptions to strike a balance between protecting public health and causing economic difficulties to businesses; by conducting this type of "cost-benefit" analysis, the Court ruled, the agency was " 'acting solely on [its] own ideas of sound public policy' and was therefore operating outside of its proper sphere of authority" (*id.* at 12). Another important factor in the Court's conclusion was that the legislature had repeatedly tried, and failed, to enact legislation to the same effect; its difficulty in coming to

terms on this issue served to highlight that the challenged regulation constituted an attempt by the agency to resolve a difficult social problem, making choices among competing considerations, which is the essence of the legislature's province (*id.* at 13). Two years later, the Court elaborated: "A key feature of *[Boreali]* . . . was that the Legislature had never articulated a policy regarding the public smoking controversy" (*Matter of Campagna v Shaffer*, 73 NY2d 237, 243 [1989]).

The *Boreali* Court acknowledged that the line between administrative rulemaking and legislative policymaking can be difficult to define, and that its determination was based on the presence of a number of "coalescing circumstances" (71 NY2d at 11). Similarly, when this Court found a violation of the separation of powers doctrine, in the New York City Board of Health's promulgation of the Sugary Drinks Portion Cap rule, it found that all four factors that had, together, established an invalid exercise of legislative power in *Boreali* were present (*see Matter of New York Statewide Coalition of Hispanic Chambers of Commerce v New York City Dept. of Health & Mental Hygiene*, 110 AD3d 1 [1st Dept 2013], *affd* 23 NY3d 681 [2014]).

■ The same is not true in the present case. Importantly, here, unlike the situation in both *Boreali* and *Coalition of Hispanic Chambers of Commerce*, the legislature had clearly articulated its policy regarding the TLC's assigned task, namely, the goal of ensuring and optimizing the comfort of riders, while protecting the public, the environment, the drivers, and the rights of medallion owners. The TLC was not left to take action based on its own ideas of sound public policy. Even if, arguendo, the TLC's adoption of the revised Taxi of Tomorrow rules may be characterized as involving policymaking, here, the parameters of that policymaking were set by the City Council in the City Charter.

Another important *Boreali* factor was absent here: the decision regarding which cars should be permitted to serve as taxis in New York City was never "an area in which the [l]egislature had repeatedly tried—and failed—to reach agreement in the face of substantial public debate and vigorous lobbying by a variety of interested factions" (71 NY2d at 13). On the contrary, that decision has been the prerogative of the TLC, without challenge, since the TLC's creation.

The other two factors considered in *Boreali* do not require extensive analysis. The motion court characterized the chal-

lenged rules as improper because they did more than "fill in the details of broad legislation describing the over-all policies to be implemented," but instead "wrote on a clean slate, creating its own comprehensive set of rules without benefit of legislative guidance" (*Boreali*, 71 NY2d at 13). However, unlike the situation in *Boreali*, here there is clear legislative guidance. The TLC was to create policy and to adopt regulations and specifications relating to the New York City taxi fleet in ways that maximized the comfort and safety of passengers and drivers, while protecting the environment and the needs of the public. The "interstices" of these directives are quite broad in nature, but the legislature's outline could not have been clearer, and its intent was properly carried out by the agency.

The final *Boreali* consideration, namely, whether the adoption of the challenged rules required special expertise in the field of public transportation policy governing taxi service, does not warrant the rejection of the revised rules. The TLC, having been assigned the task of becoming knowledgeable about all aspects of the for-hire transportation field, has now, as a practical matter, become the possessor of unique expertise in the field, and is far better equipped than the City Council to decide which vehicle, or vehicles, will best serve as New York City taxis.

Since the four factors needed to determine that the separation of powers doctrine has been violated are not present, petitioners have failed to establish that the TLC engaged in a violation of the separation of powers doctrine by promulgating the challenged rules.

■ Petitioners' repeatedly expressed concerns about the Nissan NV200 being a "non-hybrid, non-handicap-accessible vehicle" do not justify a rejection of the TLC's rules. Petitioners do not even suggest that a better, wheelchair-accessible taxi option presently exists. Almost all vehicles currently require retrofitting to become fully wheelchair accessible, and the Nissan NV200, along with all its other advantages, is modifiable by the manufacturer so that it can become fully wheelchair accessible. The model in its unmodified form also includes many features that address a number of other disabilities, such as grab handles, a wide seating area that allows for service animals, and an integrated hearing loop system.

Nor does the adoption of the Nissan NV200 violate Administrative Code § 19-533, which only required the TLC to approve at least one hybrid vehicle for purchase, whereas the TLC has

already approved three. Administrative Code § 19-533 did not require the TLC to limit the entire fleet to hybrid vehicles, or preclude its approval of a non-hybrid for use as taxis.

The City Council's delegation to the TLC of comprehensive responsibility for implementing its stated public policy in regard to the City's for-hire transportation services was a valid delegation to an agency most competent to cope with the details of optimizing taxi service while considering the concerns of all interested parties as well as the general public. We therefore uphold the TLC's adoption of the Taxi of Tomorrow program.

Accordingly, the order and judgment (one paper) of the Supreme Court, New York County (Shlomo S. Hagler, J.), entered October 11, 2013, declaring invalid the amendments to title 35, chapters 67 and 51 of the Rules of the City of New York that created the "Taxi of Tomorrow" project mandating that the Nissan NV200 would be New York City's "Official Taxicab Vehicle" effective October 2013, should be reversed, on the law, without costs, and it should be declared that the revised Taxi of Tomorrow rules and Hybrid Specifications are valid.

ACOSTA, J. (dissenting). At issue in this case is whether the Taxi and Limousine Commission (TLC) exceeded its authority under the New York City Charter and violated the separation of powers doctrine by enacting amendments to title 35, chapters 67 and 51 of the Rules of the City of New York that created the "Taxi of Tomorrow" project mandating that the Nissan NV200 would be New York City's "Official Taxicab Vehicle," effective October 2013. I believe that despite the delegation to TLC of broad policy-making powers and extensive specified duties to implement its policies and to regulate and supervise the taxi industry, in issuing the revised Taxi of Tomorrow rules, TLC exceeded its statutory authority in a manner that infringed on the City Council's legislative domain.

As relevant to the issues on appeal, the Charter provides:

> "It shall be the further purpose of [TLC], consonant with the promotion and protection of the public comfort and convenience to adopt and establish an overall public transportation policy governing taxi . . . services as it relates to the overall public transportation network of the city; to establish certain rates, standards of service, standards of insurance and minimum coverage; standards for driver safety, standards for equipment safety and

design; standards for noise and air pollution control; and to set standards and criteria for the licensing of vehicles, drivers and chauffeurs, owners and operators engaged in such services; all as more particularly set forth herein" (NY City Charter § 2300).

In addition, the Charter provides that "[t]he jurisdiction, powers and duties of [TLC] shall include the regulation and supervision of the business and industry of transportation of persons by licensed vehicles for hire in the city, pursuant to provisions of this chapter" (NY City Charter § 2303 [a]), and that such regulation and supervision shall extend to "[t]he regulation and supervision of standards and conditions of service" (§ 2303 [b] [2]), "[r]equirements of standards of safety, and design, comfort, convenience, noise and air pollution control and efficiency in the operation of vehicles" (§ 2303 [b] [6]).

Finally, the Charter provides TLC with the power to "formulat[e], promulgat[e] and effectuat[e] . . . rules and regulations reasonably designed to carry out the purposes, terms and provisions of this chapter" (§ 2303 [b] [11]).

Initially, to the extent respondents and the majority cite Charter § 2300 in support of their broad claim of authority, while that provision does state TLC's purpose of adopting an overall transportation policy relating to taxi service, it also sets forth specific tasks in connection with that purpose, and other provisions further define TLC's duties as the "regulation and supervision of standards and conditions of service" (§ 2303 [b] [2]) and "[r]equirements of standards of safety, and design, comfort, convenience, noise and air pollution control and efficiency in the operation of vehicles" (§ 2303 [b] [6]). Thus, the Charter does not confer on TLC the unfettered authority to take any action with respect to establishing an overall policy for taxi service (*see Matter of City of New York v State of N.Y. Commn. on Cable Tel.*, 47 NY2d 89, 92 [1979] ["Where an agency has been endowed with broad power to regulate in the public interest, we have not hesitated to uphold reasonable acts on its part designed to further the regulatory scheme. *This is not to say, of course, that an administrative tribunal may operate outside its lawfully designated sphere*" (citations omitted and emphasis added)]). Rather, in connection with that policymaking power, TLC has the specified authority to promulgate rules regulating the taxi industry, including by setting standards for vehicle design that involve vehicle design specifications, and to be valid, the revised rules must fall within that specified authority.

Indeed, respondents further contend that TLC's specified powers in the Charter encompass the power to issue the revised rules, arguing that TLC has set a new "standard" for safety, design, comfort and convenience—the Taxi of Tomorrow. Respondents and the majority maintain that the only difference between the Taxi of Tomorrow project and TLC's accepted past practices with respect to vehicle design rules is that the detailed specifications here are set before the car is manufactured rather than applicable to aftermarket retrofitting, and that there is little practical difference between the revised rules, which mandate a single vehicle for use, and prior rules that set requirements so specific that only one vehicle met the specification. Contrary to these arguments, TLC's authority under the Charter to make rules with respect to vehicle design is limited to rules regulating "standards" of design, and this does not include the power to issue rules mandating the exclusive use of one purpose-built vehicle manufactured by a single company.

Although TLC has, in practice and without legal challenge, at least for the last 12 years, exercised its power to regulate the requirements of standards of vehicle design in various ways, including by setting particular and detailed vehicle design specifications, even assuming courts would conclude that TLC properly issued such rules pursuant to its powers under the Charter, the revised Taxi of Tomorrow rules are of a different category. The other rules cited by TLC established design specifications that constituted "standards" in that they could, at least in theory, be satisfied by more than one product/manufacturer. In contrast, the revised rules go beyond setting standards, and require that a particular product designed by a specific manufacturer be used to the exclusion of all others. Thus, the revised rules differ, for example, from TLC design specifications that may have had the practical effect of making the stretch Crown Victoria the dominant vehicle in the market, because in that circumstance, it remained possible for other vehicles to be designed to meet the required specified standards (as was the case), whereas the revised rules entirely preclude that possibility. This distinction is significant, and it provides a sufficient basis for the conclusion that TLC exceeded its delegated authority in issuing the revised rules, regardless of whether the Taxi of Tomorrow project is rational and consistent with TLC's objectives. While TLC has broad power to set overall taxi policy and extensive specified powers with respect to setting standards of vehicle design, which includes the power to

create detailed specifications as to what design features must be included in a vehicle, by not only creating such specifications, but mandating the exclusive use of a specific make, model and manufacturer, TLC took a step beyond even the broad powers provided for it in the Charter.*

Indeed, while respondents point to the fact that in Administrative Code of the City of New York § 19-533, the City Council specifically provided that the TLC "shall approve one or more hybrid electric vehicle models for use as a taxicab within ninety days after the enactment of this law," this cuts against their position. Rather than showing that the Charter grants TLC the broad authority to choose a particular vehicle for use as a taxi, it suggests that a separate grant of authority in the form of a code provision is required to empower TLC to approve a single vehicle model for use as a taxi. In fact, in its legislative findings, the City Council noted that TLC's previous specifications for taxicabs, "while important to passenger comfort, have prevented many promising alternative fuel vehicles, which do not meet specifications by minimal amounts, from being used as taxicabs" (Local Law No. 72 [2005] of City of NY § 1).

I believe there is no merit to respondents' argument that the revised rules are analogous to prior TLC rulemaking that courts have found to be within TLC's delegated authority. For example, nothing in this Court's decisions approving of TLC's "e-hail pilot program" pursuant to Charter § 2303 (b) (9) (see Matter of Black Car Assistance Corp. v City of New York, 110 AD3d 618 [1st Dept 2013]) and TLC's financial disclosure rules under 35 RCNY former 1-02 (l) (see Matter of New York City Comm. for Taxi Safety v New York City Taxi & Limousine Commn., 256 AD2d 136 [1st Dept 1998]) provide support for the claim that the revised Taxi of Tomorrow rules are a proper exercise of TLC's power under the Charter.

Thus, while the revised rules involve concerns of safety, design, comfort and convenience, to the extent TLC did not

---

* While Nissan points out that had "TLC merely passed a rule that adopted the specifications of the Nissan NV200 taxi as minimum requirements, only the Nissan NV200 taxi would have satisfied those standards," the point remains that even if that were true at the time, other manufacturers could have decided to compete with Nissan by building a vehicle that met the same precise specifications, and by issuing the revised rules limiting the vehicle market in this manner, TLC went beyond a reasonable reading of its powers under the Charter. Also, to the extent TLC has previously authorized only certain vehicle makes as permitted for "hack-up," it does not appear that this policy may be distinguished from the revised rules, which allow for only a single model.

simply set standards in these regards, but specifically mandated the purchase of a designated vehicle, the revised rules went beyond the TLC regulation of "standards of design" permitted under the Charter, and the rule making constitutes an exercise of power that is neither expressly conferred on TLC by any provision in the Charter nor required by necessary implication (*see Saratoga County Chamber of Commerce v Pataki*, 100 NY2d 801, 823-824 [2003], *cert denied* 540 US 1017 [2003]; *Matter of New York Statewide Coalition of Hispanic Chambers of Commerce v New York City Dept. of Health & Mental Hygiene*, 110 AD3d 1, 7-8 [1st Dept 2013], *lv granted* 22 NY3d 853 [2013]).

TLC's issuance of the revised Taxi of Tomorrow rules also violated separation of powers principles by usurping the legislative authority of the City Council. First, as discussed above, despite stating TLC's purpose to establish an overall taxi-service policy, the Charter, read as a whole, specifies the actions that TLC, as an executive agency, may take in order to effectuate this policy, and rather than explicitly or implicitly authorizing TLC to issue the revised rules, a fair reading of the Charter shows that the revised rules are beyond the powers granted to TLC. Second, as discussed below, to the extent the Charter does confer on TLC broad policy-making authority, this policy-making authority must be interpreted pursuant to the principles set forth in *Boreali v Axelrod* (71 NY2d 1 [1987]), and based on those principles, TLC's issuance of the revised rules was policy-making that violated the separation of powers doctrine by usurping the legislative power of the City Council (*see Matter of Mayfield v Evans*, 93 AD3d 98, 106 n [1st Dept 2012], quoting Locke, *The Second Treatise of Civil Government*, ch XI, ¶ 134 [1690] [regarding the supremacy of the elected legislative branch as closer to the people]).

Initially, *Boreali* makes clear that "enactments conferring authority on administrative agencies in broad or general terms . . . must be construed, whenever possible, [as] . . . no broader than that which the separation of powers doctrine permits," and that to determine when "the difficult-to-define line between administrative rule-making and legislative policy-making has been transgressed," courts must consider whether certain factors, "when viewed in combination, paint a portrait of an agency that has improperly assumed for itself '[t]he open-ended discretion to choose ends' " (71 NY2d at 9-11).

The factors identified in *Boreali* are (1) whether the agency has "constructed a regulatory scheme laden with exceptions

based solely upon economic and social concerns" (71 NY2d at 11-12); (2) whether the agency "did not merely fill in the details of broad legislation describing the over-all policies to be implemented" (" 'interstitial' rule making"), but "wrote on a clean slate, creating its own comprehensive set of rules without benefit of legislative guidance" (*id.* at 13); (3) whether "the agency acted in an area in which the Legislature had repeatedly tried—and failed—to reach agreement in the face of substantial public debate and vigorous lobbying by a variety of interested factions" (*id.*); and, (4) whether the development of the regulations involved the agency's "special expertise or technical competence" (*id.* at 14).

Here, as Supreme Court found, the revised rules mandating the exclusive use of the Nissan NV200 as a taxi vehicle do not "come within the ambit of the TLC's typical administrative 'interstitial' rule-making function which had historically entailed setting standards for the technical composition of the taxicab and the medallion owners' resulting responsibility to meet such standards in the selection of their vehicles" (*Greater N.Y. Taxi Assn. v New York City Taxi & Limousine Commn.*, 42 Misc 3d 324 [2013]).

Even though broad policy-making authority has been delegated to TLC under the Charter, that delegation reflects the City Council's basic policy decision that the transportation policy established by TLC should be consonant with "the promotion and protection of the public comfort and convenience" (Charter § 2300) and the Charter specifies TLC's duties in that regard (establishing rates and various standards). Accordingly, TLC's policy must be implemented pursuant to rules that are necessary to fulfill the City Council's basic policy choice and that fall within the Charter's grant of specified powers. While the revised Taxi of Tomorrow rules are consistent with the basic policy decision in the Charter, as discussed above, they do not constitute a strict exercise of TLC's delegated rule-making powers. Instead, they reflect a determination by TLC that the traditional exercise of its power to set detailed vehicle design specifications in service of the stated policy goals is not enough, and that transportation policy would benefit from a rule providing for a single manufacturer to create a single iconic taxi vehicle for use in New York City. Since the specified power to establish design and other standards differs from and does not require or encompass the unspecified power to mandate the use of a single vehicle, this choice to promulgate the revised rules

was a policy choice outside TLC's purview and properly remained with the legislature. It was not interstitial rulemaking that merely filled in the details of TLC's delegated legislative authority.

This conclusion is supported by the fact that the City Council has, in recent years, directly involved itself in taxi policy, including by passing a code provision (Administrative Code § 19-533) requiring TLC to approve one or more hybrid vehicles, and considering options to increase the number of wheelchair-accessible vehicles. As cited earlier, in connection with section 19-533, the City Council noted that TLC's specifications for taxicabs, "while important to passenger comfort, have prevented many promising alternative fuel vehicles" (Local Law [2005] No. 72 § 1). To the extent the revised rules fail to promote, and arguably contradict, the City Council's recently stated policy preferences in favor of TLC's policy concerns of comfort, convenience and uniformity, this is a conflict in policy making that indicates a separation of powers violation. An action taken by an administrative agency that is not consistent with the policies contemplated by the legislature, may not survive constitutional scrutiny under the doctrine of separation of powers (see *Hispanic Chambers of Commerce*, 110 AD3d at 9).

Finally, while the details of the Request for Proposals, the selection of the vehicle, and the negotiated specifications may have entailed the special knowledge of TLC, respondents fail to show that TLC's decision to alter its traditional practice of setting forth detailed vehicle specifications and to mandate the replacement of the diverse taxi fleet with a single "Taxi of Tomorrow" manufactured by one company, was based on TLC's specialized knowledge and expertise, rather than based on a policy decision that should have been made by the legislative body. TLC states that its decision was "the product of a deep understanding of the deficiencies in the vehicles that comprise the existing taxi fleet, and the recognition that simply setting a broad set of specifications has failed to improve the quality of the vehicles in the fleet," but it is unclear whether TLC expertise was necessary for its conclusion that those deficiencies could not have been adequately resolved by setting detailed specifications for the ideal taxi vehicle that medallion owners would have to meet either by purchasing a conforming vehicle or by aftermarket hacking, or whether this determination was based primarily on broader policy-driven considerations.

Based on the above considerations, I believe that Supreme Court correctly found that despite the delegation to TLC of

broad policy-making powers and extensive specified duties to implement its policies and to regulate and supervise the taxi industry, in issuing the revised Taxi of Tomorrow rules, TLC exceeded its statutory authority in a manner that infringed the City Council's legislative domain.

MAZZARELLI, J.P. and MOSKOWITZ, J., concur with SAXE, J.; ACOSTA, J. dissents in a separate opinion.

Order and judgment (one paper), Supreme Court, New York County, entered October 11, 2013, reversed, on the law, without costs, and it is declared that the revised Taxi of Tomorrow rules and Hybrid Specifications are valid.