This opinion is uncorrected and subject to revision before
publication in the New York Reports.
--------------------------------------------------------------------

No. 120
Greater New York Taxi
Association, et al.,
        Appellants,
        v.
New York City Taxi and Limousine
Commission, &c., et al.,
        Respondents,
Nissan Taxi Marketing, N.A.,
LLC., et al.,
        Intervenors-Respondents.

              Mitchell Berns, for appellants.
              Elizabeth I. Freedman, for respondents.
              Peter J. Brennan, for intervenors-respondents.
              Design Trust for Public Space et al., amici curiae.

STEIN, J.:

        The New York City Taxi and Limousine Commission (TLC)

engaged in a lengthy process to create the "Taxi of Tomorrow,"

culminating in rules that established a particular make and model

of vehicle as the City's official taxicab.  We now hold that the

TLC did not exceed its authority or violate the separation of

- 1 -

powers doctrine by enacting those rules.

I.

Anyone reminiscing about New York City public transportation from the 1960s through at least the 1980s will probably evoke an image of Checker cabs driving residents and visitors through the busy City streets.  Checker Motor Corporation made the iconic American taxicab that was valued by owners for its durability, and was appreciated by passengers for its large rear seat and trunk space.  That era came to an end when the last Checker cab was produced in 1982, and they were all taken out of service as New York City taxis by the late 1990s.  Just as the Checker cab was the iconic taxi of yesteryear, the TLC sought to discover or create an iconic Taxi of Tomorrow (ToT).  That process has led to the case that is now before us.

The TLC, which regulates taxis and other cars for hire in New York City, was created in 1971 (see NY City Charter § 2300).  In order to qualify as a taxi in New York City, a vehicle must carry passengers for compensation and be equipped with a taxi meter; it must also be painted yellow and display a current TLC medallion, which indicate that the vehicle is duly licensed to pick up passengers via street hails anywhere in the City (see Administrative Code of City of NY § 19-502 [l]; § 19-504 [a] [1]; § 19-514 [a]; 34 RCNY 4-01 [b]; L 2012, ch 9, § 11; see also Greater N.Y. Taxi Assn. v State of New York, 21 NY3d 289, 298

[2013]; Tax Law § 1280 [d]).[1]  A medallion is required to operate a yellow cab, with the number of available medallions set by the State Legislature and the New York City Council (see General Municipal Law § 181; NYC Charter § 2303 [b] [4]; see also L 2011, ch 602, § 2).  Most medallions are unrestricted, although some are limited to wheelchair accessible vehicles or alternative fuel vehicles; an unrestricted medallion may be used for those types of vehicles as well.  With Checker -- which is no longer in business -- standing out as a notable exception, car manufacturers typically did not and do not design and produce vehicles with the intention that they be used as taxis.  Instead, medallion owners would buy a passenger car meeting certain specifications and then "hack-up" that vehicle by adding a partition, roof light and other required equipment that is strictly regulated by the TLC (see 35 RCNY 67-05.1A).  The use of passenger vehicles is less than ideal because taxis are subjected to long hours and rough driving conditions, as compared with average passenger vehicles.  Additionally, the use of hacked-up passenger vehicles may pose safety risks.  For example, crash testing is completed on a vehicle model before it is hacked up, and the partition that is added after crash testing may interfere

---

[1] Green cabs, also known as Boro Taxis, are permitted to pick up street hails only in areas of the City not adequately served by yellow cabs, including the boroughs outside of Manhattan (see 35 RCNY 82-52 [a]; L 2012, ch 9, § 4 [b], [c]; L 2011, ch 602; see also Tax Law § 1280 [o]).  Those taxis are not at issue here.

with the inflation of side-curtain air bags during an actual collision.

Historically, the TLC set standards for all yellow cabs based on specifications (or specs) of a make and model of vehicle that was popular for use as a taxi. In the early 2000s, after passengers complained about insufficient leg room in vehicle models approved as taxis, Ford began making the stretch Crown Victoria, and the TLC -- apparently after consulting with Ford -- increased the required minimum leg room specs for all taxis to reflect the leg room in that model. The TLC acknowledged that, for years, the Crown Victoria was "the only commercially available vehicle model that has complied" with the taxi vehicle specs (35 RCNY 67-05 [in Statement of Basis and Purpose in City Record May 5, 2011]). That model became the most popular taxi vehicle, at one point comprising approximately 90% of the City's fleet.

The TLC commenced the ToT program in 2007, partly spurred by Ford's announcement that it planned to discontinue the Crown Victoria. The process began with committees and public hearings, engaging all taxi industry stakeholders (drivers, medallion owners and passengers), with the idea of designing a vehicle that would be manufactured primarily for use as a taxi, rather than retro-fitting passenger vehicles for that purpose. As the process continued, the TLC initiated a request for proposals in late 2009, seeking a manufacturer of original

equipment to provide an innovative vehicle developed as a taxi, based on guidelines that included certain important qualities. The successful bidder would be awarded a 10-year exclusive contract for sales of this vehicle as the City's official taxi. The TLC narrowed the seven bidders down to three models, sought public and industry opinion and, finally, in mid-2011, selected the Nissan NV200 as the ToT.  Rather than incorporating the specs from that model into the rules, as the TLC had historically done, the ToT rules specify the required make and model.  Thus, with limited exceptions, the rules require each taxi owner to purchase an NV200 to replace an existing vehicle when it is retired (see 35 RCNY 51-03; 67-05.1B).

The Department of Citywide Administrative Services then entered into a Vehicle Supply Agreement (VSA) with Nissan.  The VSA included the 10-year exclusive supply contract, provided the specs for the vehicle and set a maximum manufacturer's suggested retail price, but no minimum.  Nissan was also required under the VSA to furnish a wheelchair accessible version, that would be up-fitted before delivery to any purchaser making that request, and to create a hybrid version in the future.[2]  If a vehicle superior to the NV200 becomes available after five years, the TLC

---

[2] At oral argument, the parties discussed a December 2014 amendment to the VSA (eliminating the requirement that Nissan develop a hybrid version and providing that, if one is developed, there will be no exclusivity related to the hybrid version). That amended contract is not in the record before this Court and these changes have not been reflected in the rules.

may provide notice to Nissan and terminate the VSA, unless Nissan modifies the NV200 or designs a new vehicle to match or exceed the specs of the superior vehicle.  The VSA is not directly challenged here.[3]

After a challenge to the original ToT rules (see Committee for Taxi Safety, Inc. v City of New York, 40 Misc 3d 930 [Sup Ct, New York County 2013]), the TLC enacted revised ToT rules that were essentially the same, but contained an exemption for hybrid vehicles.  Additionally, the revised rules provided new specs for hybrids, in order to bring the hybrid options more in line with the NV200.  The hybrid rules are not challenged here; rather, the current challenge is limited to the TLC's selection of one vehicle model as the exclusive gas-powered taxi eligible for use by taxi medallion owners.

Petitioners, an association of medallion owners and an individual owner of a fleet, commenced this combined CPLR article 78 proceeding and declaratory judgment action, seeking to invalidate the ToT rules and obtain a related declaration.  The

---

[3] We reject petitioners' characterization of the TLC as having entered into a partnership with Nissan.  The TLC publicly issued a request for proposals that was open to any vehicle manufacturer.  Once Nissan was chosen as the successful bidder -- again, through a lengthy public process -- the TLC necessarily worked closely with Nissan to ensure that the vehicle that was produced actually met the TLC's expectations, and to address other related issues, such as parts availability, vehicle service and conversion to a wheelchair accessible version.  Nissan was a contractor for, not a partner with, the TLC.  That agency retained its position as a regulator of all participants in the taxi industry, including the designer and supplier of the ToT.

complaint alleged, among other things, that the TLC lacked authority to enact the ToT rules and violated the separation of powers doctrine in doing so.  Supreme Court granted a motion to allow Nissan Taxi Marketing, N.A., LLC and Nissan North America, Inc. (collectively, Nissan) to intervene.  On the merits, the court held that the TLC exceeded its authority under the City Charter and violated the separation of powers by intruding in the City Council's domain, and declared that the ToT rules were invalid (see 42 Misc 3d 324 [Sup Ct, New York County 2013]).

The Appellate Division, with one Justice dissenting, reversed Supreme Court's order and judgment and declared that the rules are valid (121 AD3d 21 [1st Dept 2014]).  The same panel granted petitioners leave to appeal, and certified a question as to whether its order was properly made.[4]

## II.

Petitioners allege that the regulations challenged here are beyond the TLC's authority because they mandate a single gas-powered model as the City's official taxi vehicle, rather than setting specifications that could potentially be met by other makes and models (see 35 RCNY 67-05.1B).  Petitioners acknowledge that the TLC has the authority to enact rules with stringent specs that can only be met by one model at the time the rules are enacted.  In addition, petitioners do not dispute that

---

[4] Due to the impending implementation of the rules in April 2015, this Court granted petitioners' motion for a stay pending appeal (25 NY3d 957 [2015]).

the TLC has the authority to approve the use of a single vehicle model as part of a pilot project for limited periods of time (see NYC Charter § 2303 [b] [9]; see also Matter of Black Car Assistance Corp. v City of New York, 110 AD3d 618, 618-619 [1st Dept 2013] [holding that the 12-month pilot E-Hail Program complies with City Charter § 2303 (b) (9)]).  It is also undisputed that the City Council, itself, could enact a law limiting taxis to one model, or could specifically grant the TLC the authority to do so.[5]  Thus, the limited issue presented here is whether the TLC had the authority to require the use of a particular vehicle make and model as a taxi, as opposed to requiring taxi vehicles to meet certain specs, without the City Council explicitly specifying such authority, or whether the TLC intruded on the City Council's domain by enacting the ToT rules.

A legislature may enact a general statutory provision and delegate power to an agency to fill in the details, as long as reasonable safeguards and guidelines are provided to the agency (see Boreali v Axelrod, 71 NY2d 1, 10 [1987]).  As a creation of a legislative body, the TLC possesses the powers expressly conferred by the City Council, as well as those "required by necessary implication" (Matter of City of New York v State of N.Y. Commn. on Cable Tel., 47 NY2d 89, 92 [1979]; see

_____

[5] Any argument that a monopoly in favor of Nissan is improper is belied by these undisputed powers, which would permit the same single-source vehicle supply situation if it was achieved through a different process.

Matter of Mercy Hosp. v New York State Dept. of Social Servs., 79 NY2d 197, 203 [1992]). "[A]n agency can adopt regulations that go beyond the text of [its enabling] legislation, provided they are not inconsistent with the statutory language or its underlying purposes" (Matter of General Elec. Capital Corp. v New York State Div. of Tax Appeals, Tax Appeals Trib., 2 NY3d 249, 254 [2004]). The question before us is whether the authority granted to the TLC by the City Council included the power to enact the ToT rules, or whether the agency has exceeded its authority and acted in a manner not contemplated by the legislative body (see Matter of New York State Superfund Coalition, Inc. v New York State Dept. of Envtl. Conservation, 18 NY3d 289, 294 [2011]).

The issues of delegation of power and separation of powers overlap and are often considered together (see Boreali, 71 NY2d at 9). This makes sense because, if an agency was not delegated the authority to enact certain rules, then it would usurp the authority of the legislative branch by enacting those rules. "The constitutional principle of separation of powers . . . requires that the [l]egislature make the critical policy decisions, while the executive branch's responsibility is to implement those policies" (Bourquin v Cuomo, 85 NY2d 781, 784 [1995]). The branches of government cannot always be neatly divided, however, and common sense must be applied when reviewing a separation of powers challenge (see id. at 785). As long as

the legislature makes the basic policy choices, the legislation need not be detailed or precise as to the agency's role (see id.).

The City Council granted the TLC extremely broad authority to enact rules, including the ToT rules.  The TLC was created with the stated purposes of "continuance, further development and improvement of taxi and limousine service in the city of New York" (NY City Charter § 2300).  The City Charter provides that the TLC is authorized,

> "consonant with the promotion and protection of the public comfort and convenience[,] to adopt and establish an overall public transportation policy governing taxi . . . services as it relates to the overall public transportation network of the city; to establish . . . standards for equipment safety and design; . . . and to set standards and criteria for the licensing of vehicles" used in taxi service (NY City Charter § 2300 [emphasis added]).

"The jurisdiction, powers and duties of the [TLC] shall include the regulation and supervision of the business and industry of transportation of persons by licensed vehicles for hire in the city" (NY City Charter § 2303 [a]).  Such powers extend to, among other things, "standards and conditions of service" (NY City Charter § 2303 [b] [2]), "[r]equirements of standards of safety, and design . . . of vehicles" (NY City Charter § 2303 [b] [6] [emphasis added]),  "[t]he development and effectuation of a broad public policy of transportation . . . as it relates to forms of public transportation in the city, including innovation

and experimentation in relation to type and design of equipment"
(NY City Charter § 2303 [b] [9] [emphasis added]), and the
promulgation of rules to carry out the TLC's purposes (see NY
City Charter § 2303 [b] [11]).

In granting the TLC this broad authority, the City
Charter includes guidelines for the TLC to consider, such as
"safety, and design, comfort, convenience, noise and air
pollution control and efficiency in the operation of vehicles"
(NY City Charter § 2303 [b] [6]).  Although the TLC has generally
applied the "specs method" when promulgating rules about the
design of taxis, it points to a major shortcoming of that method
-- the situation where no available model meets the specs in the
rules as, for example, when Ford discontinued the Crown Victoria
(see 35 RCNY 67-05 [in Statement of Basis and Purpose in City
Record May 5, 2011]).  The TLC determined that "[t]he most
obvious alternative to vehicle specifications [is the]
competitive selection of taxicab vehicle models," as embodied in
the ToT project (35 RCNY 67-05 [in Statement of Basis and Purpose
in City Record May 5, 2011]).  This new method was intended to be
a more efficient way to reach the same result and, in our view,
falls within the broad authority granted to the TLC.[6]

_____

[6] Petitioners argue that no agency has the authority to
require medallion owners to enter into a contract with a
particular manufacturer.  Nevertheless, the rules under the specs
method, while not explicitly stating so, had the effect of
requiring owners to purchase a specific vehicle from a single
manufacturer when only one vehicle model complied with those

In Boreali, the seminal case addressing the proper
delegation of power, this Court set out four "coalescing
circumstances" that are non-mandatory, somewhat-intertwined
factors for courts to consider when determining whether an agency
has crossed the hazy "line between administrative rule-making and
legislative policy-making" (71 NY2d at 11).  The first factor is
whether the agency did more than "balanc[e] costs and benefits
according to preexisting guidelines," but instead made "value
judgments entail[ing] difficult and complex choices between broad
policy goals" to resolve social problems (Matter of New York
Statewide Coalition of Hispanic Chambers of Commerce v New York
City Dept. of Health & Mental Hygiene, 23 NY3d 681, 698 [2014]
[extending Boreali and separation of powers analysis to City
agencies delegated powers under the City Charter]).  Under the
enabling legislation, the TLC was given the authority to make
certain policy choices, consistent with the guidelines enumerated
therein, and it has done so here.  In developing the ToT rules,
the TLC balanced the costs and benefits to all interested parties
-- passengers, owners, drivers and the general public -- using

---

specs (i.e., the Ford stretch Crown Victoria).  Petitioners do
not complain about those rules and, in fact, have acknowledged
that the TLC has the authority to make rules with specs that can
be met by only one model.  In our view, perhaps aside from the
time period involved, this is a distinction without a difference.
In any event, the ToT rules do not actually limit owners of
unrestricted medallions to one model; they can currently choose
the NV200, any of three hybrid models that meet the hybrid
exemption and specs, or a wheelchair accessible model (see 35
RCNY 67-05.1B [b]).

many of the same guidelines that it previously used to develop rules with specs. The goal under both the specs method and the single model approach was to select the best taxi for all involved. Enactment of the ToT rules did not entail a difficult and complex choice among policy goals reserved for the City Council (see Matter of New York City Comm. for Taxi Safety v New York City Taxi & Limousine Commn., 256 AD2d 136, 137 [1st Dept 1998] [holding that the TLC had authority to make rules requiring financial disclosure by medallion owners and related parties]), or an intrusion into "economic and social concerns . . . outside of [the TLC's] proper sphere of authority" (Boreali, 71 NY2d at 12). Nor is the City Charter's grant of authority to the TLC to create vehicle "standards" limited to the creation of specs. Rather, the broad authority granted to the TLC allows for the designation of a single vehicle model that was specifically designed -- through a lengthy public process -- to be a taxi. The choice of the best possible vehicle for use as a taxi plainly fits within the purposes of the TLC to develop and improve taxi service as part of the City's overall public transportation system (see NYC Charter §§ 2300; 2303 [b] [9]).

The second Boreali factor is whether the agency merely filled in details of a broad policy or if it "wrote on a clean slate, creating its own comprehensive set of rules without benefit of legislative guidance" (Boreali, 71 NY2d at 13). The TLC was not writing on a clean slate in the sense that it has

always regulated the taxi industry as to almost every detail of operation.  The City Council has largely left taxi regulation to the TLC, with little interference.  The only instance of intervention identified by the parties was when the City Council required the TLC to "approve one or more hybrid electric vehicle models for use as a taxicab" (Administrative Code of City of NY § 19-533 [emphasis added]).  The City Council's use of the words "one or more," together with the direction that the TLC approve a "model or models" (Administrative Code § 19-533 [emphasis added]), rather than specs, constitutes some legislative guidance from which we can infer that the Council generally recognized the single model method as within the TLC's authority.

The third Boreali factor is whether the legislature has unsuccessfully tried to reach agreement on the issue, which would indicate that the matter is a policy consideration for the elected body to resolve (see Boreali, 71 NY2d at 13). Petitioners' argument that the City Council has debated the one-model issue and failed to come to a resolution is without foundation.  The bills that petitioners identify dealt with other matters, such as requiring all taxis to be hybrids or wheelchair accessible, not with whether all gas-powered taxis should be one model.  Petitioners have not demonstrated that the Council tried, but failed, to make all taxis a single model.  Additionally, there is no dispute that the TLC has historically based its specs on particular models; the practical result of that practice has

not been meaningfully different from limiting the citywide fleet to one model. Where an agency has promulgated regulations in a particular area for an extended time without any interference from the legislative body, we can infer, to some degree, that the legislature approves of the agency's interpretation or action (see Matter of Medical Socy. of State of N.Y. v Serio, 100 NY2d 854, 866 [2003]; compare Matter of New York Statewide Coalition of Hispanic Chambers of Commerce, 23 NY3d at 692-693, 700; Boreali, 71 NY2d at 13). As noted, the City Council has generally refrained from intervening in the TLC's broad regulation of the taxi industry -- including as to the specific question at issue here -- for over four decades.

The fourth Boreali factor, whether the agency used special expertise or competence in the field to develop the challenged regulations (see Boreali, 71 NY2d at 13-14), is neutral in this case. Technical expertise was clearly essential to select the single best model as the ToT, but not necessarily to decide whether to limit the selection to one model (regardless of which vehicle was chosen).

As noted, these factors are not mandatory, need not be weighed evenly, and are essentially guidelines for conducting an analysis of an agency's exercise of power. When this Court recently conducted a Boreali analysis in Matter of New York Statewide Coalition of Hispanic Chambers of Commerce, to determine whether an agency's ban on large sugary drinks was

permissible regulation, as opposed to impermissible policy-making, we focused on whether the challenged regulation attempted to resolve difficult social problems concerning matters of personal autonomy by "interfer[ing] with commonplace daily activities preferred by large numbers of people" (23 NY3d at 698-699 [noting that, while few people would risk the safety of their children near unguarded apartment windows, a significant number of people regularly overindulge in sugary drinks]).  Viewing the ToT rules with this overall focus, and concluding that they do not involve difficult social problems of any nature, our analysis compels the determination that the TLC engaged in proper rulemaking, rather than improper legislating.

Given the broad statutory powers granted to the TLC to set policy as guided by enumerated safeguards and guidelines, the TLC did not exceed its authority or intrude on the City Council's domain in violation of the separation of powers doctrine by enacting the ToT rules.  Accordingly, the order of the Appellate Division should be affirmed, with costs, and the certified question answered in the affirmative.

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

Order affirmed, with costs, and certified question answered in the affirmative.  Opinion by Judge Stein.  Chief Judge Lippman and Judges Read, Pigott, Rivera, Abdus-Salaam and Fahey concur.

Decided June 25, 2015