[58 NYS3d 651]

In the Matter of LEADINGAGE NEW YORK, INC., et al., Appellants-Respondents, v NIRAV SHAH, as Commissioner of Health, et al., Respondent-Appellants. (Proceeding No. 1.)

In the Matter of COALITION OF NEW YORK STATE PUBLIC HEALTH PLANS et al., Appellants-Respondents, v NEW YORK STATE DEPARTMENT OF HEALTH et al., Respondents-Appellants. (Proceeding No. 2.)

Third Department, June 22, 2017

12

**APPEARANCES OF COUNSEL**

*O'Connell & Aronowitz*, Albany (*Cornelius D. Murray* of counsel), and *Hinman & Straub, PC*, Albany (*David T. Luntz* of counsel), for LeadingAge New York, Inc. and others, appellants-respondents.

*O'Melveny & Meyers, LLP*, New York City (*Henry M. Greenberg* of *Greenberg Traurig, LLP*, Albany, and *James W. Lytle* of *Manatt, Phelps & Phillips, LLP*, Albany, of counsel), for Coalition of New York State Public Health Plans and others, appellants-respondents.

*Eric T. Schneiderman, Attorney General*, New York City (*Matthew W. Grieco* of counsel), for respondents-appellants.

**OPINION OF THE COURT**

PETERS, P.J.

Cross appeal from a judgment of the Supreme Court (Hartman, J.), entered November 17, 2015 in Albany County, which partially dismissed petitioners' applications, in two combined proceedings pursuant to CPLR article 78 and actions for declaratory judgment, to declare invalid certain regulations promulgated by respondent Department of Health.

Respondent Department of Health (hereinafter DOH) is responsible for overseeing a number of state programs to provide medical services to needy New Yorkers, the most prominent of which is Medicaid. Including federal Medicaid funds, the money entrusted to DOH for public health programs for the 2016-2017 fiscal year surpasses $137 billion, which includes $63 billion in state Medicaid funds (*see* NY St Div of Budget, *2016-2017 Executive Budget Briefing Book* at 83). DOH directs a significant portion of these funds to private entities that provide health care services to New Yorkers under agreements with DOH and local governments that act on DOH's behalf.

In January 2012, Governor Andrew Cuomo issued Executive Order No. 38 (hereinafter EO38) (*see* Executive Order [Cuomo] No. 38 [9 NYCRR 8.38]) to a number of his appointees, including respondent Commissioner of Health, instructing them to ensure that taxpayer funds allocated for services to needy New Yorkers are primarily spent on providing services to such persons, rather than on overhead expenses. EO38 was triggered by a task force investigation, which had revealed that some "providers of services that receive[d] [s]tate funds or [s]tate-authorized payments . . . used such funds to pay for excessive administrative costs and outsized compensation for their senior executives" (9 NYCRR 8.38). "[S]uch abuses," EO38 stressed, "harm both the people of New York who are paying for such services, and those persons who must depend upon such services to be available and well-funded" (9 NYCRR 8.38). EO38 accordingly directed DOH, among other covered state agencies, to promulgate regulations aimed at curbing "abuses in executive compensation and administrative costs and ensur-[ing] that taxpayer dollars are used first and foremost to help New Yorkers in need" (9 NYCRR 8.38). To accomplish this goal,

EO38 elaborated, the regulations must direct that "[n]o less than [75%] of the [s]tate financial assistance or [s]tate-authorized payments to a provider for operating expenses shall be directed to provide direct care or services rather than to support administrative costs" (9 NYCRR 8.38 [2] [a]). This percentage was to "increase by [5%] each year" so that, as of April 2015, 85% of state-authorized payments to providers would be directed "to provide direct care or services rather than to support administrative costs" (9 NYCRR 8.38 [2] [a]). EO38 further instructed the agencies, "[t]o the extent practicable," not to provide funding for executive compensation above $199,000 per year (9 NYCRR 8.38 [2] [b]). The $199,000 figure was intended to reflect the highest salary paid to executives in the federal government, which could be adjusted annually for the cost of living and other factors (see 9 NYCRR 8.38 [2] [b]). Finally, EO38 directed that the regulations could allow, "under appropriate circumstances and upon a showing of good cause," a waiver from compliance for certain providers (9 NYCRR 8.38 [3]).

In May 2013, DOH promulgated regulations, codified in 10 NYCRR part 1002, which imposed limits on administrative expenses[1] and executive compensation of certain health care providers that receive state financial assistance or state-authorized funds (hereinafter the hard cap) (see 10 NYCRR 1002.2 [a]; 1002.3 [a]). The regulations also placed the same restrictions upon certain providers that receive funding from all sources, including nontaxpayer funds, except under certain conditions (hereinafter the soft cap) (see 10 NYCRR 1002.3 [b]). Before adopting the regulations, DOH published a proposed rule and accepted public comments for a full year, and thereafter made multiple rounds of revisions in response to those comments (see 34 NY Reg, Oct. 31, 2012 at 42; 35 NY Reg, Mar. 13, 2013 at 36; 35 NY Reg, Apr. 10, 2013 at 16; 35 NY Reg, May 29, 2013 at 12).

Consistent with EO38, 10 NYCRR part 1002 requires the "covered providers" to file an annual disclosure form with DOH regarding their allocation of state funds (10 NYCRR 1002.5)

---

1. "Administrative expenses" are costs that "cannot be attributed directly to the provision of program services" (10 NYCRR 1002.1 [a]). An employee's salary is not considered an administrative expense to the extent that the salary supports the employee's work directly providing services to the public, or that the employee's work "contributes directly to the quality or scope of the program services provided" (10 NYCRR 1002.1 [i] [1] [i]).

and generally prohibits such providers from using state funds or state-authorized payments for executive compensation given directly or indirectly to a "covered executive" in an amount greater than $199,000 per annum (10 NYCRR 1002.3 [a]). The regulations further provide that, where the covered providers' executive compensation exceeds $199,000 per year from any source of funding (i.e., state or non-state), the covered provider will be subject to penalties if such compensation either (1) is "greater than the 75th percentile of that compensation provided to comparable executives in other providers of the same size and within the same program service sector and the same or comparable geographic area as established by a compensation survey identified, provided, or recognized by [DOH] and the Director of the Division of the Budget"; or (2) was not reviewed and approved by the board of directors or equivalent governing body of the covered provider after taking into consideration "appropriate comparability data" (10 NYCRR 1002.3 [b]). However, the restriction on executive compensation would not apply to limit reimbursement with state funds or state-authorized payments for "reasonable compensation paid to a covered executive for program services, including but not limited to supervisory services performed to facilitate the covered provider's program services, rendered by the executive outside of his or her managerial or policy-making duties" (10 NYCRR 1002.3 [c]).

The regulations also provide that any covered provider may apply for a waiver of the executive compensation and/or administrative costs limits upon a showing of "good cause," which consideration takes into account various factors such as the extent to which the availability and quality of the program services that the subject provider provides would be negatively affected without a waiver, as well as the nature, size and complexity of the provider's operations (10 NYCRR 1002.4 [a], [b]).[2] If a covered provider fails to comply with the limitations on executive compensation or administrative expenses and has not obtained a waiver, it is subject to suspension, modification or termination of its service contract or its license to deliver DOH program services or, where possible and consistent with federal and state laws, the redirection of state funds or state-authorized payments (see 10 NYCRR 1002.6 [a], [d]).

---

2. A waiver may be granted on a long-term basis or for a single reporting cycle, as warranted by the circumstances (see 10 NYCRR 1002.4 [a]). DOH must decide a waiver application within 60 days of its receipt (see 10 NYCRR 1002.4 [a] [3]).

Shortly after their promulgation, petitioners separately commenced these hybrid proceedings seeking to invalidate the subject regulations on the grounds that they violate the separation of powers doctrine and are arbitrary and capricious. The proceedings were consolidated and, after joinder of issue, Supreme Court issued a detailed and comprehensive decision finding that, with the exception of the soft cap provision, the regulations at issue were a constitutional exercise of authority by DOH and are neither arbitrary nor capricious. Accordingly, the court partially granted the petitions and declared the soft cap provision invalid as violative of separation of powers principles. This cross appeal ensued.

Petitioners contend, and the dissent agrees, that both the hard cap and the soft cap components of the subject regulations violate the constitutional separation of powers doctrine. "The concept of the separation of powers is the bedrock of the system of government adopted by this [s]tate in establishing three coordinate and coequal branches of government, each charged with performing particular functions" (*Matter of NYC C.L.A.S.H., Inc. v New York State Off. of Parks, Recreation & Historic Preserv.*, 27 NY3d 174, 178 [2016] [internal quotation marks and citations omitted]; *see* NY Const, art III, § 1; art IV, § 1). The separation of powers doctrine " 'requires that the [L]egislature make the critical policy decisions, while the executive branch's responsibility is to implement those policies' " (*Greater N.Y. Taxi Assn. v New York City Taxi & Limousine Commn.*, 25 NY3d 600, 609 [2015], quoting *Bourquin v Cuomo*, 85 NY2d 781, 784 [1995]).

"The cornerstone of administrative law is derived from the principle that the Legislature may declare its will, and after fixing a primary standard, endow administrative agencies with the power to fill in the interstices in the legislative product by prescribing rules and regulations consistent with the enabling legislation" (*Matter of Nicholas v Kahn*, 47 NY2d 24, 31 [1979] [citations omitted]; *see Greater N.Y. Taxi Assn. v New York City Taxi & Limousine Commn.*, 25 NY3d at 608). "In so doing, an agency can adopt regulations that go beyond the text of that legislation, provided they are not inconsistent with the statutory language or its underlying purposes" (*Matter of General Elec. Capital Corp. v New York State Div. of Tax Appeals, Tax Appeals Trib.*, 2 NY3d 249, 254 [2004] [citation omitted]; *accord Matter of Allstate Ins. Co. v Rivera*, 12 NY3d 602, 608 [2009]; *Matter of WL, LLC v Department of Economic Dev.*, 97

AD3d 24, 29 [2012], *affd sub nom. James Sq. Assoc. LP v Mullen*, 21 NY3d 233 [2013]). We are mindful that "[t]he branches of government cannot always be neatly divided"; thus, "common sense must be applied when reviewing a separation of powers challenge" (*Greater N.Y. Taxi Assn. v New York City Taxi & Limousine Commn.*, 25 NY3d at 609; *see Bourquin v Cuomo*, 85 NY2d at 784-785).

As recently reaffirmed by the Court of Appeals, *Boreali v Axelrod* (71 NY2d 1 [1987]) continues to be "the touchstone for determining whether agency rulemaking has exceeded legislative fiat" (*Matter of NYC C.L.A.S.H., Inc. v New York State Off. of Parks, Recreation & Historic Preserv.*, 27 NY3d at 178; *see Matter of Acevedo v New York State Dept. of Motor Vehs.*, 29 NY3d 202, 221 [2017]; *Matter of New York Statewide Coalition of Hispanic Chambers of Commerce v New York City Dept. of Health & Mental Hygiene*, 23 NY3d 681, 692-693 [2014]). *Boreali* "set out four 'coalescing circumstances' . . . for courts to consider when determining whether an agency has crossed the hazy 'line between administrative rule-making and legislative policy-making' " (*Greater N.Y. Taxi Assn. v New York City Taxi & Limousine Commn.*, 25 NY3d at 610, quoting *Boreali v Axelrod*, 71 NY2d at 11; *see Matter of Acevedo v New York State Dept. of Motor Vehs.*, 29 NY3d at 222). These circumstances are

> "whether (1) the agency did more than balance costs and benefits according to preexisting guidelines, but instead made value judgments entailing difficult and complex choices between broad policy goals to resolve social problems; (2) the agency merely filled in details of a broad policy or if it wrote on a clean slate, creating its own comprehensive set of rules without benefit of legislative guidance; (3) the [L]egislature has unsuccessfully tried to reach agreement on the issue, which would indicate that the matter is a policy consideration for the elected body to resolve; and (4) the agency used special expertise or competence in the field to develop the challenged regulation" (*Matter of NYC C.L.A.S.H., Inc. v New York State Off. of Parks, Recreation & Historic Preserv.*, 27 NY3d at 179-180 [internal quotation marks, brackets and citations omitted]; *see Matter of Spence v Shah*, 136 AD3d 1242, 1245 [2016], *lv denied* 27 NY3d 908 [2016]).

The *Boreali* factors "are not mandatory, need not be weighed evenly, and are essentially guidelines for conducting an analysis of an agency's exercise of power" (*Greater N.Y. Taxi Assn. v New York City Taxi & Limousine Commn.*, 25 NY3d at 612; accord *Matter of NYC C.L.A.S.H., Inc. v New York State Off. of Parks, Recreation & Historic Preserv.*, 27 NY3d at 180; see *Matter of Acevedo v New York State Dept. of Motor Vehs.*, 29 NY3d at 222). The "central theme" of the *Boreali* analysis is that "an administrative agency exceeds its authority when it makes difficult choices between public policy ends, rather than finds means to an end chosen by the [L]egislature" (*Matter of New York Statewide Coalition of Hispanic Chambers of Commerce v New York City Dept. of Health & Mental Hygiene*, 23 NY3d at 700; see *Matter of NYC C.L.A.S.H., Inc. v New York State Off. of Parks, Recreation & Historic Preserv.*, 27 NY3d at 180; *Boreali v Axelrod*, 71 NY2d at 11).

Pursuant to Public Health Law §§ 201 and 206, as well as Social Services Law § 363-a, cited by DOH as statutory bases for promulgating 10 NYCRR part 1002, DOH has broad authority to regulate the use of public health funds. In particular, DOH is empowered to "regulate the financial assistance granted by the state in connection with all public health activities" (Public Health Law § 201 [1] [o]) and to "receive and expend funds made available for public health purposes pursuant to law" (Public Health Law § 201 [1] [p]). DOH is further authorized to enter into contracts and agreements with private providers "as may be deemed necessary and advisable to carry out the general intent and purposes of the [P]ublic [H]ealth [L]aw . . . within the limit of funds available" (Public Health Law § 206 [3]; see State Finance Law § 163 [1] [c]; [9] [f]). Finally, DOH has the responsibility under the enabling statutes of specific programs—in particular, Medicaid—to ensure the provision of "high-quality medical care" throughout the state and to utilize its administrative rule-making authority to promulgate regulations necessary to carry out those programs (Social Services Law § 363; see Social Services Law § 363-a [2]; see also Public Health Law § 201 [1] [v]; see e.g. 18 NYCRR part 504). As "the agency charged with administering the Medicaid program in this [s]tate," DOH has "inherent authority to protect the quality and value of services rendered by providers in that program" (*Matter of Medicon Diagnostic Labs.*

*v Perales*, 74 NY2d 539, 542, 545 [1989]).[3] Among DOH's chief responsibilities in this realm is "to identify . . . methods to contain the growth of [M]edicaid spending" (Social Services Law § 363-c [1] [a]; *see* Social Services Law § 364 [1] [b]) and "to pursue administrative enforcement actions against those accused of perpetrating fraud, abuse, waste or other illegal or inappropriate acts within the [Medicaid] program" (*Matter of Winslow v New York State Off. of the Medicaid Inspector Gen.*, 90 AD3d 1455, 1456 [2011]; *see* Public Health Law § 32 [6]; 18 NYCRR 515.3; *Matter of Koch v Sheehan*, 21 NY3d 697, 702 [2013]).

While none of the aforementioned statutes expressly authorizes the creation of the administrative cost and executive compensation limits, as previously observed, " '[a]n agency can adopt regulations that go beyond the text of [its enabling] legislation, provided they are not inconsistent with the statutory language or its underlying purposes' " (*Greater N.Y. Taxi Assn. v New York City Taxi & Limousine Commn.*, 25 NY3d at 608, quoting *Matter of General Elec. Capital Corp. v New York State Div. of Tax Appeals, Tax Appeals Trib.*, 2 NY3d at 254; *see Matter of Acevedo v New York State Dept. of Motor Vehs.*, 29 NY3d at 221; *Goodwin v Perales*, 88 NY2d 383, 395 [1996]). As determined by the Second Department, which has upheld 10 NYCRR part 1002 as constitutional, the administrative cost and executive compensation limits contained in the subject regulations

> "are not inconsistent with the above statutory provisions or their underlying purpose of obtaining high-quality services with limited available funds . . . [and] directly further[ ] the purposes of those statutory provisions by ensuring that . . . DOH awards service contracts to agencies that will use most of the tax dollars they receive directly on the provision of services rather than upon administrative overhead and executive compensation" (*Agencies for Children's Therapy Servs., Inc. v New York State Dept. of Health*, 136 AD3d 122, 130 [2015] [citations omitted], *appeal dismissed* 26 NY3d 1132 [2016], *lv denied* 27 NY3d 907 [2016]; *see Concerned*

---

**3.** Medicaid was originally supervised by the former Department of Social Services. In 1997, the responsibility for Medicaid oversight was transferred to DOH (*see* L 1997, ch 436, § 122 [a], [e]; *Matter of Koch v Sheehan*, 21 NY3d 697, 702 [2013]).

*Home Care Providers, Inc. v New York State Dept. of Health*, 45 Misc 3d 703, 713 [Sup Ct, Suffolk County 2014], *affd* 134 AD3d 1065 [2015], *appeal dismissed* 27 NY3d 941 [2016], *lv denied* 27 NY3d 907 [2016]).

Indeed, petitioners admit the breadth of DOH's authority over the use of public health funds, specifically conceding that DOH has regulated health expenditures "for a very long time" and that the statutes cited by DOH in adopting part 1002 provide it with a "mandate" to "regulate what it pays for and how it spends money on the public health" (*see Concerned Home Care Providers, Inc. v New York State Dept. of Health*, 45 Misc 3d at 713).

While recognizing DOH's broad power to regulate funding for health care providers and to enter into contracts for the provision of services and care, petitioners nonetheless claim that DOH exceeded its legislatively-granted authority with respect to both the hard cap and the soft cap components of 10 NYCRR part 1002. In our view, however, application of the *Boreali* framework to the hard cap provision leads to the contrary conclusion.

Applying the first *Boreali* factor to the hard cap portion of 10 NYCRR part 1002, which, as previously discussed, places limits on administrative costs and executive compensation derived from state funds or state-authorized payments, "DOH did not attempt to resolve a complex issue implicating broad political, social, and economic concerns beyond its purview or to act on its own idea of sound policy" (*Agencies for Children's Therapy Servs., Inc. v New York State Dept. of Health*, 136 AD3d at 130; *compare Matter of New York Statewide Coalition of Hispanic Chambers of Commerce v New York City Dept. of Health & Mental Hygiene*, 23 NY3d at 697-699; *Boreali v Axelrod*, 71 NY2d at 12). DOH has the statutory obligation to ensure that scarce taxpayer dollars are used efficiently and for the benefit of those who are the recipients of the services, and routinely promulgates regulations setting reimbursement rates for the government-funded care and services (*see generally Signature Health Ctr., LLC v State of New York*, 92 AD3d 11, 15-17 [2011], *lv denied* 19 NY3d 811 [2012]). Nor has DOH created a regulation "laden with exceptions based solely upon economic and social concerns" that was premised "on its own conclusions about the appropriate balance of trade-offs between health and cost to particular industries in the private sector" (*Boreali v*

*Axelrod*, 71 NY2d at 12). Notably, "the promulgation of regulations necessarily involves an analysis of societal costs and benefits" and, here, in view of DOH's broad authority to regulate the use of public health funds and the underlying purpose of its enabling statutes to ensure that such funds will be used primarily on direct care and services to those in need, it cannot be said that DOH "had 'not been given any legislative guidelines at all for determining how the competing concerns of public health and economic cost are to be weighed' " (*Matter of New York Statewide Coalition of Hispanic Chambers of Commerce v New York City Dept. of Health & Mental Hygiene*, 23 NY3d at 697-698, quoting *Boreali v Axelrod*, 71 NY2d at 12).[4]

Moreover, any exceptions in 10 NYCRR part 1002, such as the waiver provisions, rather than constituting legislative compromises, "further . . . DOH's purpose of ensuring the efficient provision of quality services with the limited funds it has to disburse" (*Agencies for Children's Therapy Servs., Inc. v New York State Dept. of Health*, 136 AD3d at 131). For instance, to the extent that 10 NYCRR part 1002 takes into account its financial effect on providers, it does so by allowing a waiver only when the inability to pay a particular salary would damage the quality of program services in the provider's local area (*see* 10 NYCRR 1002.4 [b] [2]). As such, the waiver provision is not a political concession; rather, it is a means to preserve the regulations' underlying purpose of ensuring that providers continue to offer high-quality services for the benefit of New Yorkers.

Considering the second *Boreali* factor, DOH did not write "on a clean slate," but "merely fill[ed] in the details of broad legislation describing the over-all policies to be implemented" (*Boreali v Axelrod*, 71 NY2d at 13-14). Again, " '[t]he Legislature is not required in its enactments to supply agencies with rigid marching orders' " (*Matter of NYC C.L.A.S.H., Inc. v New York State Off. of Parks, Recreation & Historic Preserv.*, 125 AD3d 105,

---

4. The dissent refuses to read DOH's enabling statutes in conjunction, opting instead to parse out the separate grants of power and declare them insufficient for serving as a basis for promulgating 10 NYCRR part 1002. Moreover, the dissent relies on inapplicable precedent in pursuing this task. *Subcontractors Trade Assn. v Koch* (62 NY2d 422, 428 [1984]), relied on by petitioners, and its progeny (*see Under 21, Catholic Home Bur. for Dependent Children v City of New York*, 65 NY2d 344, 359 [1985]), cited by the dissent, only prohibit an agency from using its contracting power to promote *nonfiscal* "social goals," such as affirmative action (*Matter of New York State Health Facilities Assn. v Axelrod*, 77 NY2d 340, 349 [1991]).

110 [2014], *affd* 27 NY3d 174 [2016], quoting *Matter of Citizens For An Orderly Energy Policy v Cuomo*, 78 NY2d 398, 410 [1991]). As aptly noted by Supreme Court, DOH's regulation of the amount of state funds or state-authorized payments that can be used to pay executive compensation and administrative expenses fulfills its statutory mandate to "administer taxpayer funding programs efficiently to get the biggest bang for the buck in the delivery of health care and services" (*Matter of LeadingAge N.Y., Inc. v Shah*, 56 Misc 3d 594, 604 [Sup Ct, Albany County 2015]; *see Agencies for Children's Therapy Servs., Inc. v New York State Dept. of Health*, 136 AD3d at 131). Indeed, where, as here, "an agency has been endowed with broad power to regulate in the public interest, [courts] have not hesitated to uphold reasonable acts on its part designed to further the regulatory scheme" (*Matter of Campagna v Shaffer*, 73 NY2d 237, 242 [1989] [internal quotation marks and citation omitted]; *see Matter of New York State Assn. of Criminal Defense Lawyers v Kaye*, 96 NY2d 512, 518 [2001]; *Matter of City of New York v State of N.Y. Commn. on Cable Tel.*, 47 NY2d 89, 92 [1979]; *Matter of Independent Master Plumbers of Westchester County, Inc. v Westchester County Bd. of Plumbing Examiners*, 13 AD3d 374, 375 [2004]; *see also McKinney v Commissioner of N.Y. State Dept. of Health*, 41 AD3d 252, 253 [2007], *appeal dismissed* 9 NY3d 891 [2007], *lv denied* 9 NY3d 815 [2007]).[5]

Analyzing the third *Boreali* factor, DOH did not improperly intrude on an area that is a matter of a "prolonged legislative deadlock" (*Agencies for Children's Therapy Servs., Inc. v New York State Dept. of Health*, 136 AD3d at 131). That the Governor, one day prior to the issuance of EO38, had submitted substantially the same limits on reimbursable administrative costs and executive compensation as part of his 2012

---

5.   Contrary to the dissent's position, the hard cap provision of 10 NYCRR part 1002 cannot be viewed as attempting to control internal governance of private businesses. These regulations apply to providers who, although private in nature, (1) entered into a voluntary agreement to provide DOH program services paid for with public funds, (2) receive an average of $500,000 or more in such funding across a two-year period and (3) receive at least 30% of their in-state revenue from state funds or state-authorized payments over the same two-year period (*see* 10 NYCRR 1002.1 [d]; *see also* 18 NYCRR 504.3 [i]). Moreover, once paid, state funds and state-authorized payments remain the subject of DOH's regulatory authority (*see Matter of Visiting Nurse Serv. of N.Y. Home Care v New York State Dept. of Health*, 5 NY3d 499, 505-506 [2005]; *Clove Lakes Nursing Home v Whalen*, 45 NY2d 873, 874 [1978]; *Matter of DMN Mgt. Servs., LLC v Daines*, 79 AD3d 37, 39-40 [2010]).

budget bill, which legislation was not enacted, does not establish that the issue lay exclusively within the legislative realm (*see id.*). Indeed, courts have recognized "the necessity of 'some overlap between the three separate branches' of government as well as the 'great flexibility' to be accorded the Governor in determining the methods of enforcing legislative policy" (*Bourquin v Cuomo*, 85 NY2d at 785, quoting *Clark v Cuomo*, 66 NY2d 185, 189 [1985]).

Petitioners also point to a 2012 Senate hearing and report of the New York Senate's Standing Committee on Investigations and Government Operations, as well as to several legislative proposals addressing executive compensations for not-for-profit corporations. However, the two Senate bills (*see* 2012 NY Senate Bill S6930; 2013 NY Senate Bill S5198) addressed only executive compensation, not administrative expenses, and neither concentrated on entities participating in the state's health care funding programs. The Non-Profit Revitalization Act of 2013 (hereinafter NPRA) (*see* L 2013, ch 549, § 58 [2013 NY Assembly Bill A8072]) was a general revision of the laws governing the state's nonprofit sector and did not relate to 10 NYCRR part 1002's aim of supervising the use of public funds paid to both for-profit and not-for-profit health care providers.[6]

To be sure, only one cited bill (*see* 2013 NY Assembly Bill A6616) proposed limits similar to those at issue in this case. However, neither the aforementioned unsuccessful bills nor the 2013 legislation are sufficient to establish that the matters addressed in EO38 and the regulations governing the use of public funds paid to health care providers lay exclusively within the province of the Legislature (*see Bourquin v Cuomo*, 85 NY2d at 787-788; *Agencies for Children's Therapy Servs., Inc. v New York State Dept. of Health*, 136 AD3d at 131-132). Notably, with the exception of the NPRA, none of the bills relied on by petitioners made it past a committee. This case therefore does not involve the repeated and extensive failed legislative attempts that the Court of Appeals found significant in *Boreali* (*see Boreali v Axelrod*, 71 NY2d at 7, 13). In any event, even accepting the claim that the Legislature has consistently attempted to reach an agreement with regard to this issue, it has been repeatedly emphasized that " '[l]egislative inaction, because of its inherent ambiguity, affords the most dubious

---

**6.** Indeed, only one out of the 132 sections of the NPRA related to matters of executive compensation by restricting not-for-profit employees from voting on their own compensation (*see* L 2013, ch 549, § 58).

foundation for drawing positive inferences' " (*Matter of Oswald N.*, 87 NY2d 98, 103 n 1 [1995], quoting *Clark v Cuomo*, 66 NY2d at 190-191; *accord Matter of Acevedo v New York State Dept. of Motor Vehs.*, 29 NY3d at 225).

As to the fourth *Boreali* factor, the development of 10 NYCRR part 1002 resulted from DOH's special expertise in regulating public health care spending (*see Matter of NYC C.L.A.S.H., Inc. v New York State Off. of Parks, Recreation & Historic Preserv.*, 27 NY3d at 184-185), and "DOH did not merely restate the provisions contained in the Governor's proposed legislation" (*Agencies for Children's Therapy Servs., Inc. v New York State Dept. of Health*, 136 AD3d at 132). DOH's expertise is manifested by the comprehensive nature of the subject regulations, which include not only the limits on administrative costs and executive compensation, but also the waiver, reporting and penalty provisions. The regulations were enacted only after receiving extensive public comment about how such limits would affect all the stakeholders (*see id.*).

■ On balance, the *Boreali* factors weigh heavily in favor of DOH. Accordingly, we conclude that the subject regulations, to the extent that they place a limit on administrative costs and executive compensation paid for by state funds and state-authorized payments, do not violate the separation of powers doctrine (*see id.* at 127-132; *Concerned Home Care Providers, Inc. v New York State Dept. of Health*, 45 Misc 3d at 713-714).

We reach a different conclusion, however, with regard to the soft cap provision of 10 NYCRR part 1002. The soft cap provision, which was not included in EO38, restricts executive compensation paid from all sources except under certain circumstances. Absent a waiver, covered providers may not pay covered executives more than $199,000 from "any" sources of funding without incurring penalties unless (1) the amount of compensation is less than "the 75th percentile of that compensation provided to comparable executives in other providers of the same size and within the same program service sector and the same or comparable geographic area" based on a compensation survey recognized by the Division of the Budget, and (2) the amount has been reviewed and approved by the covered provider's board of directors or equivalent governing body, and such review "include[d] an assessment of appropriate comparability data" (10 NYCRR 1002.3 [b]).

■ Applying the *Boreali* analysis, we part company with the Second Department and find that, unlike with the hard cap

provision, DOH exceeded its authority in adopting the soft cap portion of 10 NYCRR part 1002. First, by attempting to regulate executive compensation from all sources, DOH was acting on its own ideas of sound public policy. Relatedly, inasmuch as the soft cap provision ventures outside DOH's legislative mandate to manage the efficient and effective use of taxpayer money for health care and related services, DOH was not engaged in mere interstitial rulemaking.[7] Finally, DOH has no special expertise in administering regulations governing the overall executive compensation or competence in regulating corporate governance as such. As noted by Supreme Court, "[t]he 'soft cap' regulation meddles significantly in the decision-making processes of corporations' governing bodies, both substantively by setting the '75 percent' rule, and procedurally by defining the approval processes themselves" (*Matter of LeadingAge N.Y., Inc. v Shah*, 56 Misc 3d 594, 608). Accordingly, the soft cap provision cannot pass constitutional muster and, therefore, was properly invalidated by Supreme Court (*see Matter of New York Statewide Coalition of Hispanic Chambers of Commerce v New York City Dept. of Health & Mental Hygiene*, 23 NY3d at 697-701; *Boreali v Axelrod*, 71 NY2d at 12-16).

▇ To the extent that petitioners assert that the hard cap provision of 10 NYCRR part 1002 should be invalidated as arbitrary and capricious, we find such claim to be utterly devoid of merit. It is firmly established that " 'a [s]tate regulation should be upheld if it has a rational basis and is not unreasonable, arbitrary, capricious or contrary to the statute under which it was promulgated' " (*Matter of NYC C.L.A.S.H., Inc. v New York State Off. of Parks, Recreation & Historic Preserv.*,

---

7. Despite petitioners' assertions to the contrary, neither the Not-For-Profit Corporation Law, Business Corporation Law nor the Limited Liability Company Law prevents DOH from promulgating regulations governing the administrative costs and executive compensation derived from taxpayer funds. All three statutes have language making corporate powers "subject to any limitations provided in . . . any other statute of this state" (N-PCL 202 [a]; Business Corporation Law § 202 [a]; Limited Liability Company Law § 202). Supreme Court properly viewed this language as subjecting the corporations' general powers to more specific limitations imposed not only by other statutes, but also by regulations duly promulgated thereunder. Because the Legislature authorized DOH to establish limits on health care expenses paid for by taxpayer funds, the regulations pertaining to administrative costs and the hard cap on executive compensation do not conflict with these statutes (*see Matter of Sullivan Fin. Group, Inc. v Wrynn*, 94 AD3d 90, 97 [2012]).

125 AD3d at 111, quoting *Kuppersmith v Dowling*, 93 NY2d 90, 96 [1999]). "To meet this 'limiting' standard, petitioners must show that the [r]egulations are 'so lacking in reason' that they are 'essentially arbitrary' " (*Matter of Acevedo v New York State Dept. of Motor Vehs.*, 29 NY3d at 226-227, quoting *Kuppersmith v Dowling*, 93 NY2d at 96; *see Matter of Consolation Nursing Home v Commissioner of N.Y. State Dept. of Health*, 85 NY2d 326, 331-332 [1995]).

Both empirical evidence and sound agency judgment support the promulgation of 10 NYCRR part 1002 (*see generally Matter of Catholic Med. Ctr. of Brooklyn & Queens v Department of Health of State of N.Y.*, 48 NY2d 967, 968-969 [1979]). These regulations were adopted after a task force investigation revealed that certain service providers had used state funds to pay themselves excessive compensation instead of using such funds in furtherance of public health programs (*see e.g. Matter of Sullivan Fin. Group, Inc. v Wrynn*, 94 AD3d at 97). Furthermore, the regulations are supported by data regarding spiraling health care costs, particularly those associated with Medicaid. DOH's Medicaid spending has grown by approximately 60% in just 12 years, and DOH's non-Medicaid spending nearly tripled (*compare* NY St Div of Budget, *2016-2017 Executive Budget Briefing Book* at 83, *with* NY St Dept of Health, *Strengthening New York's Public Health System for the 21st Century* at 18 [Dec. 2003]). Additionally, New York's per capita Medicaid spending has been twice the national average (*see* NY St Health Found, *Health Care Costs and Spending in New York State* at 31 [Feb. 2014]).

In support of their claim of irrationality, petitioners maintain that 10 NYCRR part 1002 applies "across the board, without any consideration of the size and complexity of the organization, geographic location or the type of service provider." Yet, these are precisely the considerations that the waiver provisions of part 1002 incorporate (*see* 10 NYCRR 1002.4 [a] [2]; [b] [2]; *cf. Matter of New York State Health Facilities Assn. v Axelrod*, 77 NY2d 340, 350 n 3 [1991]). Petitioners are also incorrect in asserting that part 1002 will diminish the quality of services in less affluent geographic regions of the state, as the regulations specifically permit above-benchmark salaries where necessary to ensure "program services . . . at the same levels of quality and availability" (10 NYCRR 1002.4 [a] [2] [ii]). Furthermore, any concerns that DOH will arbitrarily administer the rule are simply too speculative and, therefore, are inher-

ently ill-suited to a facial declaratory judgment (*see Matter of New York State Health Facilities Assn. v Axelrod*, 77 NY2d at 350 n 3; *Police Benevolent Assn. of N.Y. State Troopers, Inc. v New York State Div. of State Police*, 40 AD3d 1350, 1353 [2007], *appeal dismissed and lv denied* 9 NY3d 942 [2007]).[8] Accordingly, petitioners have failed to carry their heavy burden of demonstrating either that 10 NYCRR part 1002 is arbitrary and capricious or that DOH acted irrationally in promulgating these regulations (*see Matter of New York State Corr. Officers & Police Benevolent Assn., Inc. v New York State Off. of Mental Health*, 138 AD3d 1205, 1209 [2016]; *Matter of Spence v Shah*, 136 AD3d at 1246; *Matter of NYC C.L.A.S.H., Inc. v New York State Off. of Parks, Recreation & Historic Preserv.*, 125 AD3d at 111-112).

MULVEY, J. (concurring in part and dissenting in part). I agree with the majority only insofar as it holds that respondent Department of Health (hereinafter DOH) acted in excess of its authority with respect to the soft cap component of 10 NYCRR part 1002. I otherwise respectfully dissent and would grant the petitions in their entirety.

In my view, DOH acted in excess of its statutory authority with regard to both components of 10 NYCRR part 1002 and, therefore, I would hold that part 1002 is unconstitutional as a violation of the separation of powers doctrine (*contra Agencies for Children's Therapy Servs., Inc. v New York State Dept. of Health*, 136 AD3d 122 [2015], *appeal dismissed* 26 NY3d 1132 [2016], *lv denied* 27 NY3d 907 [2016]). I would also nullify part 1002 on the ground that it "is so lacking in reason for its promulgation that it is essentially arbitrary" (*New York State Assn. of Counties v Axelrod*, 78 NY2d 158, 166 [1991] [internal quotation marks and citation omitted]).

DOH has the responsibility to oversee state programs that provide medical services and is entrusted, through its Medicaid program, with approximately $140 billion paid out annually to private entities that deliver those services to eligible residents. It cites four statutes for its authority to see that these funds are properly spent: Public Health Law §§ 201 and 206, Social Services Law § 363-a and State Finance Law § 163 (1) (c) and

---

8. The dissent's conclusion that "there is no record support for DOH's assertion that these regulatory steps will ensure that public funds are directed to services rather than salaries and overhead" is perplexing, given that 10 NYCRR 1002.3 (b) and 1002.5 provide DOH with tools to screen for such possibilities (dissenting op at 31).

(9) (f). Public Health Law § 201 (1) (o) directs DOH to "regulate the financial assistance granted by the state in connection with all public health activities"; Public Health Law § 201 (1) (p) empowers DOH to "receive and expend funds made available for public health purposes pursuant to law"; Public Health Law § 206 (3) empowers DOH to "enter into such contracts or agreements with individuals . . . associations, [and] corporations . . . as may be deemed necessary and advisable to carry out the general intent and purposes of the public health law" and to use such contracts to "provide for payment by the state, within the limit of funds available, for . . . services." Social Services Law § 363-a (2) directs DOH to "make such regulations . . . as may be necessary" to implement a plan for medical assistance as required by federal law. State Finance Law § 163 relates to the fairness of the state's procurement process in dealing with the business community and requires that state agencies purchase goods and services from responsible vendors. Subdivision (1) (c) of State Finance Law § 163 defines responsibility of a contracting entity to mean "the financial ability, legal capacity, integrity, and past performance of a business entity" and subdivision (9) (f) requires every state agency to make a determination of responsibility of a proposed contractor prior to making a contract award. The question before us is whether these statutes empower DOH to control the fiscal operations of private entities.

"The constitutional principle of separation of powers, implied by the separate grants of power to each of the coordinate branches of government, requires that the Legislature make the critical policy decisions, while the executive branch's responsibility is to implement those policies" (*Bourquin v Cuomo*, 85 NY2d 781, 784 [1995] [internal quotation marks and citations omitted]). Although "there need not be a specific and detailed legislative expression authorizing a particular executive act as long as 'the basic policy decisions underlying the [executive action] have been made and articulated by the Legislature' " (*id.* at 785, quoting *Matter of New York State Health Facilities Assn. v Axelrod*, 77 NY2d 340, 348 [1991]), "when the Executive acts inconsistently with the Legislature, or usurps its prerogatives, . . . the doctrine of separation is violated" (*Clark v Cuomo*, 66 NY2d 185, 189 [1985]).

As the majority explains, our constitutional analysis must begin with an application of the conceptual framework set forth in *Boreali v Axelrod* (71 NY2d 1 [1987]). In considering the

first *Boreali* factor, it is clear, in my opinion, that DOH is attempting to balance the state's concern for efficient use of taxpayer funds allocated to health care against the interests of private businesses in administering their internal fiscal affairs. As noted in *Boreali*, striking the proper balance among competing concerns "is a uniquely legislative function," yet it may nevertheless be proper if the agency has been given legislative guidelines for weighing those concerns (*id.* at 12). Here, DOH has not cited any specific guidelines other than its broad responsibility for state health care spending and its authority to review providers' overall fiscal responsibility per State Finance Law § 163 (1) (c) and (9) (f). Contrary to both the majority's view and the Second Department's conclusion in *Agencies for Children's Therapy Servs., Inc. v New York State Dept. of Health* (136 AD3d at 130), I find that none of the statutes cited by DOH suffices as a basis for this measure. DOH's authority to control its own expenditures cannot be reasonably interpreted as authority to control how providers spend earned revenues for past services. The authority to review the overall fiscal responsibility of a provider, through State Finance Law § 163, is premised on the employment of criteria, including the provider's "financial ability, legal capacity, integrity, and past performance" (State Finance Law § 163 [1] [c]), none of which has been shown to bear on these expenditures.[1] Without legislative guidance, DOH reached its own conclusion that the measure was justified by what it describes as spiraling health care costs and past misuse of monies paid to certain providers.

Turning to the second *Boreali* factor, I find that 10 NYCRR part 1002 does not merely fill in the details of broad legislation, since the Legislature has not provided any general statutory guidance on limiting the salary and expenses of private entities. The broad statutory authority for DOH to determine what services it pays for, and how it spends state funds on public health, cannot be reasonably interpreted as authority to control internal governance of private businesses. The Legislature's signals on this issue are to the contrary and were evident when neither house adopted the caps proposed in the Governor's 2012-2013 budget bill. Separate bills introduced on behalf

---

1. Nor can the power to enter into contracts with providers of goods and services to the state be used to enact policies not adopted by the Legislature (*see Under 21, Catholic Home Bur. for Dependent Children v City of New York*, 65 NY2d 344, 359 [1985]).

of the Governor during the 2012 session proposed compensation caps and were not reported out of committee. It is, therefore, clear that DOH was writing "on a clean slate, creating its own comprehensive set of rules without benefit of legislative guidance" (*Boreali v Axelrod*, 71 NY2d at 13), thereby indicating a usurpation of legislative authority.

With regard to the third *Boreali* factor, the topics of executive compensation and administrative costs in certain business entities have been the subject of some degree of legislative attention, which suggests that the matter is a policy consideration for the elected body to resolve (*see Greater N.Y. Taxi Assn. v New York City Taxi & Limousine Commn.*, 25 NY3d 600, 611-612 [2015]). The Legislature has stated that business corporations have the power to set the compensation of corporate officers, employees and agents (*see* Business Corporation Law § 202 [a] [10]), and that the compensation of officers, employees and agents in not-for-profit corporations should be reasonable (*see* N-PCL 202 [a] [12]). In general, the Legislature has made it clear that the management of for-profit corporations, not-for-profit corporations and limited liability companies remains vested in the governing body of the organization (*see* Business Corporation Law §§ 701, 702; N-PCL 701, 702; Limited Liability Company Law § 401). On the issue of limiting executive compensation and administrative costs in entities paid from state funds, several bills have been introduced over several legislative sessions, yet the Legislature has not reported any out of committee. These facts demonstrate that the issue is squarely before the Legislature and that there is insufficient support for these restrictions. Per *Boreali*, "it is the province of the people's elected representatives, rather than appointed administrators, to . . . mak[e] choices among competing ends" (*Boreali v Axelrod*, 71 NY2d at 13).

As to the fourth *Boreali* factor, there is no indication in this record that DOH has any special expertise in the fiscal operations of private businesses.[2] Private sector business operation has not been demonstrated to be an area where the technical competence of a state agency is needed to "flesh out details of

---

**2.** The majority finds that these regulations pass this component of the *Boreali* test because they are the result of DOH's special expertise in regulating public health care spending, yet, in holding that the soft caps are unconstitutional, the majority also finds that DOH "has no special expertise in administering regulations governing the overall executive compensation or competence in regulating corporate governance" (majority op at 25). If the latter is true, then both caps must fail this part of the *Boreali* test.

the broadly stated legislative polic[y]" (*id.* at 14). I note that these same caps have been promulgated by 12 other state agencies, so it is beyond dispute that they were not developed through the special expertise of DOH. Indeed, DOH has failed to furnish any facts or expert analysis revealing a nexus between state health care spending and providers' choices regarding payment of administrative expenses and executive compensation. Although the Legislature has conferred broad powers on DOH to administer funds for public health services, after considering these factors together, I find that these restrictions represent an intrusion into the prerogative of that branch.

Finally, in addition to this constitutional infirmity, 10 NYCRR part 1002 is voidable as arbitrary and capricious, since DOH has furnished no evidence to establish any linkage between the costs paid by these providers for executive compensation and administration and the problem identified by the Governor in his Executive Order. The majority states that, "[b]oth empirical evidence and sound agency judgment support the promulgation" (majority op at 26). However, the majority neglects to reveal that evidence and offers no basis for its conclusion that the agency's judgment on this issue is sound. "It is well-settled that a [s]tate regulation should be upheld if it has a rational basis and is not unreasonable, arbitrary, capricious or contrary to the statute under which it was promulgated" (*Kuppersmith v Dowling*, 93 NY2d 90, 96 [1999] [citations omitted]). The challengers have a heavy burden to show that the regulation is unsupported by any evidence (*see Matter of Consolation Nursing Home v Commissioner of N.Y. State Dept. of Health*, 85 NY2d 326, 331-332 [1995]). I agree with petitioners that there is no record support for DOH's assertion that these regulatory steps will ensure that public funds are directed to services rather than salaries and overhead (*compare Matter of Spence v Shah*, 136 AD3d 1242 [2016], *lv denied* 27 NY3d 908 [2016]). This Court has noted the significant extent of scientific studies and factual evidence examined by DOH in formulating a regulation requiring health care personnel to wear surgical or procedural masks when encountering patients or residents during influenza season, a record that stands in stark contrast to the dearth of evidence presented here (*id.*). The caps have not been demonstrated through "rational, documented, empirical determination" to have any connection to reducing state health care expenditures or to the more efficient use of taxpayer funds in the delivery of services (*New York State Assn. of Counties v Axelrod*, 78 NY2d at 168).

Accordingly, for the reasons stated, I would modify the judgment by reversing so much thereof as partially dismissed the petitions/complaints, and grant them in their entirety.

McCARTHY, EGAN JR. and AARONS, JJ., concur with PETERS, P.J.; MULVEY, J., concurs in part and dissents in part in a separate opinion.

Ordered that the judgment is affirmed, without costs.